827 A.2d 230

FIRST AMERICAN TITLE INSURANCE COMPANY, PLAINTIFF–APPELLANT, v. EDWARD LAWSON, JR., ESQ., WHEELER, LAWSON & SNYDER, L.L.P., SUMMIT BANK, ADAM M. SLATER, JILL L. SLATER, K. HOVNANIAN AT WAYNE VII, INC., KENNETH E. WHEELER, ESQ. AND CRAIG J.J. SNYDER, ESQ., DEFENDANTS.

LAWYERS TITLE INSURANCE CORPORATION, PLAINTIFF–APPELLANT, v. WHEELER, LAWSON & SNYDER, L.L.P., KENNETH C. WHEELER, ESQ., EDWARD LAWSON, JR., ESQ., CRAIG J.J. SNYDER, ESQ. AND SEAN G. MASON, DEFENDANTS.

CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, PLAINTIFF–RESPONDENT, v. EDWARD LAWSON, JR., ESQ., KENNETH E. WHEELER, ESQ., CRAIG J.J. SNYDER, ESQ. AND WHEELER, LAWSON & SNYDER, L.L.P., DEFENDANTS, AND K. HOVNANIAN AT WAYNE VII, INC., FIRST AMERICAN TITLE INSURANCE COMPANY AND LAWYERS TITLE INSURANCE CORPORATION, INTERESTED PARTIES.

Argued March 3, 2003—Decided July 17, 2003.

*Richard L. Plotkin* argued the cause for appellant First American Title Insurance Company (*Pitney, Hardin, Kipp & Szuch,* attorneys; *Mr. Plotkin* and *Deborah L. Slowata,* on the brief).

*Russell M. Finestein* and *Michael D. Malloy* argued the cause for appellant Lawyers Title Insurance Corporation (*Finestein & Malloy,* attorneys).

*Diane J. O'Neil* and *Robert F. Priestley* argued the cause for respondent (*Mendes & Mount*, attorneys; *Ms. O'Neil, Mr. Priestly* and *Laura E. Genovese*, on the brief).

The opinion of the Court was delivered by

VERNIERO, J.

This case presents difficult questions concerning an attorney's exposure to uninsured liability while practicing in a law firm organized as a limited liability partnership. The firm's coverage also is at stake. Specifically, the firm's managing partner knowingly had made material misrepresentations when he applied to an insurer for malpractice coverage on behalf of the firm and its members. The Appellate Division concluded that such misrepresentations entitled the insurer to consider the firm's coverage void *ab initio,* that is, to treat that coverage as if it had never existed for any of the firm's attorneys or for the firm itself. We reverse in part, and affirm in part. We hold that the firm's policy is void in respect of the firm as an entity and any defalcating partner, but not in respect of any innocent partner.

I.

The record in this case is extensive. We summarize only the procedural history and facts that are relevant to our disposition. The parties do not dispute those facts.

Edward Lawson, Jr. obtained his New Jersey law license in 1992. Kenneth E. Wheeler was licensed to practice law in Connecticut and in the District of Columbia, but was not licensed in New Jersey. Lawson and Wheeler formed a law partnership in late 1996 or early 1997. In the spring or summer of 1997, Craig J.J. Snyder joined the firm, which then became Wheeler, Lawson & Snyder, L.L.P. Snyder drew up a formal partnership agreement between the parties and registered the firm as a limited liability partnership with the New Jersey Secretary of State. During all times relevant to this action, Snyder was licensed to practice law in New York and maintained the firm's Manhattan office. Unlike

Lawson and Wheeler, Snyder performed little or no work in the firm's New Jersey office, which was located in Guttenberg.

According to Lawson's deposition testimony, Wheeler acted as a closing attorney for several real estate transactions in New Jersey, even though he was not licensed to practice here. Consistent with that testimony, Wheeler acted as Lawson's own attorney in a closing involving residential real estate in Mahwah in January 1999.

Lawson further testified that he had "delegated" to Wheeler the authority to open and maintain the firm's bank accounts and to maintain the firm's account ledgers. Wheeler purportedly "knew everything that was going on with the books[.]" In that regard, the firm's "check writing system ... [and] the on-line banking system [were] on [Wheeler's] computer." Lawson also indicated that Wheeler "did most, if not all, of the arrangements with the banks" in respect of distributing real-estate closing checks, regardless of which attorney actually had handled the particular transaction. All three partners apparently had signatory authority over the firm's business account. In a certification, however, Snyder indicates that he "never transferred any funds to, from, or within the [f]irm's New Jersey business or trust accounts." The record indicates that only Wheeler and Lawson issued checks from the firm's trust account. Lawson considered Wheeler the firm's managing partner.

In late 1997 or early 1998, Lawson discovered that Wheeler had been transferring money improperly from various client accounts, including that of Lawson's widowed mother, into other client accounts and into the firm's business account. When Lawson confronted Wheeler with that discovery, Wheeler responded that the monies were necessary to pay the firm's expenses. Rather than halt the practice, Lawson joined Wheeler in what became essentially

a "kiting" scheme whereby monies from one client trust account would be transferred to pay the obligations of another client. Monies were also being transferred from client trust accounts to the law firm's business account to pay expenses of the law firm, including partners' draws. On occasion, Lawson also used client trust

account funds, including those of his mother, for his own personal use. By all accounts, Snyder was neither privy, nor a party, to this scheme.

[*First American Title Ins. Co. v. Lawson*, 351 *N.J.Super.* 407, 414, 798 A.2d 661 (App.Div.2002).]

On behalf of the firm and its members in December 1997, Wheeler applied for professional liability insurance through Jamison Special Risk, Inc. (Jamison), a domestic broker for Certain Underwriters for Lloyd's of London (Underwriters). Wheeler provided information required by the application and verified the application as a whole. For that purpose, Wheeler used a CNA application form instead of a form designed specifically for Underwriters.

. In completing the application, Wheeler confronted the following three-part question:

After inquiry, is any attorney in your firm aware of:

a. Any professional liability claims made against the firm or any member of the firm within the past 12 months?

b. Any acts, error or omissions in professional services that may reasonably be expected to be the basis of a professional liability claim?

c. Have all claims and/or incidents been reported to CNA?

Wheeler checked the box marked "NO" for questions a and b and did not check an answer for question c.

On April 30, 1998, Wheeler signed a warranty statement asserting to Underwriters that the information on the CNA application was accurate and that the insurer could rely on it. Based on that application and statement, Underwriters subscribed a professional liability policy on the firm's behalf, beginning April 19, 1998, and expiring April 19, 1999. The policy defines "Insured" to include the firm as the "Named Insured" and "any lawyers who are partners in the Named Insured ... but solely for Acts on behalf of the Named Insured[.]" The insurer also issued a certificate of insurance, dated May 8, 1998, naming the Clerk of this Court as certificate holder.

The firm facilitated financing for the policy by entering into an agreement with Imperial Premium Finance, Inc. (Imperial). Under that agreement, the firm designated Imperial as its attorney-

in-fact, granting it the right to cancel the policy if the firm did not pay the required premiums. When it did not receive a payment of premium due in December 1998, Imperial purportedly mailed the firm a notice of intent to cancel the policy. The cancellation eventually occurred as of January 16, 1999. Jamison, Underwriters' broker, wrote to Wheeler offering to reinstate the policy should Imperial receive the firm's payment of premium and a renewed warranty statement.

At about the same time, this Court's Office of Attorney Ethics (OAE) notified the firm that the OAE would be conducting an audit of the firm's books. The OAE acted as a result of three grievances that it had received concerning the firm's handling of certain real estate transactions. That notice is dated January 8, 1999.

On January 22, 1999, presumably after the firm had received the audit notice, Wheeler executed the new warranty. In so doing, he affirmed:

> I am not aware of any claims being made during the past five years against the firm or any of its past or present owners, partners, shareholders, corporate officers or employees or predecessors in business. I am also not aware of any circumstances or any allegations or contentions as to any incident, which may result in a claim being made against the firm or any of its past or present owners, partners, shareholders, corporate officers or employees or its predecessors in business.

Wheeler delivered the warranty to Jamison by faxing it on January 26, 1999.

On that same day, the OAE sought the temporary suspension of Lawson from the practice of law. This Court suspended Lawson about a week later, *In re Lawson,* 157 *N.J.* 79, 722 *A.*2d 1288 (1999), and ultimately disbarred him. *In re Lawson,* 165 *N.J.* 201, 755 *A.*2d 1167 (2000).

As a result of the numerous defalcations, First American Title Insurance Company (First American) and Lawyers Title Insurance Corporation (Lawyers Title) (collectively, the title insurers) each paid claims to various individuals. The title insurers in turn sought recovery from the firm and its partners. More specifically, First American initiated this action by filing a verified complaint

alleging that Lawson, as counsel to certain buyers, did not pay $339,212 due to a seller of real property. First American also named the firm as a defendant. It filed a second complaint reasserting the prior claims and adding claims that Lawson had failed to satisfy an outstanding mortgage in the approximate amount of $97,285 in another real estate closing in which he represented the buyer. In the second complaint (which eventually was consolidated with the first complaint), First American included Lawson's two partners, Wheeler and Snyder, as individual defendants.

Similarly, Lawyers Title brought a complaint against the firm and against Wheeler, Lawson, and Snyder individually. That complaint alleges that certain clients of Lawson, who were purchasers of real property, deposited $143,763 into a client trust account. It asserts that the check that Lawson had issued from that account to pay off a prior mortgage on the property was returned for insufficient funds. Lawyers Title further alleges that Lawson failed to record a mortgage as representative for another purchaser of real property.

Apparently unaware of the firm's legal problems, Jamison notified Wheeler in February 1999, that the firm's policy had been reinstated. Snyder thereafter sent Jamison a notice of insurance claim regarding the above matters. The carrier denied those claims.

Underwriters then filed a declaratory judgment action alleging that the firm's policy "was cancelled as of January 16, 1999" and that the purported reinstatement "was void by reason of the material misrepresentation set forth in the Warranty[.]" After Underwriters had filed that action, Lawyers Title amended its complaint, asserting additional counts against both the firm and its individual partners. First American amended its complaint to assert that the firm's limited liability partnership status should be declared void for failure to maintain professional liability insurance as required by our Rules of Court.

Snyder answered Underwriters' complaint and asserted certain affirmative defenses, including that he "never supervised, condoned or encouraged [Lawson] to commit any of the acts alleged in the complaint." Snyder also filed a cross-claim for contribution from, and indemnification by, Lawson and filed a counterclaim against Underwriters for coverage under the firm's policy. Underwriters answered Snyder's counterclaim by denying his claims for coverage and asserting certain separate defenses, including that the policy was cancelled as of January 16, 1999, and was not reinstated validly. Underwriters' answer further asserts that the policy excluded coverage for "claims arising out of criminal conduct or activity, as well as claims arising out of any dishonest, fraudulent, malicious or intentional acts."

The three actions eventually were consolidated. First American, Lawyers Title, and Underwriters filed respective motions seeking summary judgment. The trial court consolidated the parties' motions and disposed of them by orders issued in July 2001 and September 2001.

Although it concluded that the firm's policy did not insure against Lawson's and Wheeler's "criminal and/or dishonest conduct," the trial court found that the policy did cover the firm's liability as a separate legal entity distinct from that of its individual partners. The court concluded that the firm's insurance with Underwriters was not void and had not been cancelled properly. It thus granted summary judgment in favor of the title insurers and against Underwriters, indicating that the former entities were "entitled to coverage under [Underwriters'] policy for their respective damages to be determined at a subsequent hearing[.]"

The Appellate Division granted leave to appeal on behalf of Underwriters and reversed the trial court's determination in a reported decision. *First American, supra,* 351 *N.J.Super.* at 412, 417 n. 2, 798 *A.*2d 661. The panel held that the above facts rendered the policy void for all purposes. *Id.* at 426, 798 *A.*2d 661. In view of that conclusion, the Appellate Division did not resolve any issue that was dependent on the policy's existence, such as

whether Underwriters properly had cancelled the policy in accordance with its contractual terms and applicable statutory law. *Ibid.* First American and Lawyers Title moved separately before this Court for leave to appeal, and we granted both motions. 174 *N.J.* 357, 807 *A.*2d 191 (2002).

## II.

To resolve this appeal, we must analyze the interplay between two established bodies of law. The first set of rules, arising in the corporate field, establishes the parameters of liability for individual partners of a limited liability partnership. The second, arising under insurance law, permits an insurer to rescind coverage when an insured, in applying for that coverage, has misrepresented a material fact. Because the parties' dispute centers on the conduct of attorneys, we also must consider our Rules of Court that seek to protect consumers of legal services by mandating that New Jersey attorneys maintain adequate insurance in certain circumstances. This case ultimately requires us to strike an appropriate balance in applying those sometimes competing tenets.

## A.

We briefly review the law governing limited liability partnerships. At all times relevant to this action, those rules were codified under the Uniform Partnership Law, *N.J.S.A.* 42:1–1 to –49 (UPL or Law). In December 2000, the Legislature repealed and replaced the UPL with the Uniform Partnership Act, *N.J.S.A.* 42:1A–1 to –56, *L.* 2000, *c.* 161 (UPA or Act). Because the parties do not dispute that the UPL was in effect when this action's underlying facts arose, we focus our analysis on that statute rather than on the current UPA.

The UPL states, in relevant part:

c. Subject to subsection d. of this section, a partner in a limited liability partnership is not liable, either directly or indirectly, by way of indemnification, contribution, assessment or otherwise, for debts, obligations and liabilities of or chargeable to the partnership, whether in tort, contract or otherwise, arising from negligence,

omissions, malpractice, wrongful acts, or misconduct committed while the partnership is a limited liability partnership and in the course of the limited liability partnership business by another partner or an employee, agent, or representative of the limited liability partnership.

d. Subsection c. of this section shall not affect the liability of a partner in a limited liability partnership for his own negligence, omissions, malpractice, wrongful acts, or misconduct, or that of any person under his direct supervision and control.

[*N.J.S.A.* 42:1–15, *L.* 1995, *c.* 96, § 3.]

The UPL also incorporates agency principles to the law governing partnerships. The statute provides:

Every partner is an agent of the partnership for the purpose of its business, and the act of every partner, including the execution in the partnership name of any instrument, for apparently carrying on in the usual way the business of the partnership of which he is a member binds the partnership, unless the partner so acting has in fact no authority to act for the partnership in the particular matter, and the person with whom he is dealing has knowledge of the fact that he has no such authority.

[*N.J.S.A.* 42:1–9.1, *L.* 1919, *c.* 212, § 9.]

Harmonizing the meaning of the above provisions, two principles emerge under the UPL. First, any partner can execute any instrument, such as an application for insurance requiring the payment of premiums, and in so doing can bind the partnership as a whole in the ordinary course of its business. Thus, any one partner can incur general business indebtedness on the partnership's behalf. Second, when a firm is a limited liability partnership, a special rule exists to shield partners from incurring liability arising solely from the wrongful acts of fellow partners. Although they remain liable for their own personal misconduct, partners of a limited liability partnership are not responsible for the professional negligence or wrongful acts of other partners.

## B.

The law is well settled that equitable fraud provides a basis for a party to rescind a contract. *Jewish Ctr. of Sussex Cty. v. Whale*, 86 *N.J.* 619, 432 *A.*2d 521 (1981). "In general, equitable fraud requires proof of (1) a material misrepresentation of a presently existing or past fact; (2) the maker's intent that the

other party rely on it; and (3) detrimental reliance by the other party." *Liebling v. Garden State Indem.*, 337 *N.J.Super.* 447, 453, 767 *A.2d* 515 (App.Div.), *certif. denied,* 169 *N.J.* 606, 782 *A.2d* 424 (2001). Rescission voids the contract *ab initio,* meaning that it is considered "null from the beginning" and treated as if it does not exist for any purpose. *Black's Law Dictionary* 1568 (7th ed.1999). Within the context of an insurance contract,

a representation by the insured, whether contained in the policy itself or in the application for insurance, will support the forfeiture of the insured's rights under the policy if it is untruthful, material to the particular risk assumed by the insurer, and actually and reasonably relied upon by the insurer in the issuance of the policy.

[*Allstate Ins. Co. v. Meloni,* 98 *N.J.Super.* 154, 158–59, 236 *A.2d* 402 (App.Div. 1967).]

In evaluating an insurance application that calls for subjective information, there is an additional inquiry, *i.e.,* whether the insured knew that the information was false when completing the application. *Ledley v. William Penn Life Ins. Co.,* 138 *N.J.* 627, 636, 651 *A.2d* 92 (1995). Examples of subjective information include when an insurer asks an insured to indicate a belief about the status of his or her health, *ibid.,* or when, as here, an insurer asks whether an applicant "is aware of any circumstances which may result in a claim being made against the firm[.]" *First American, supra,* 351 *N.J.Super.* at 419, 798 *A.2d* 661. "[A] subjective question will not constitute equitable fraud if the question is directed toward probing the knowledge of the applicant and determining the state of his mind and ... the answer is a correct statement of the applicant's knowledge and belief[.]" *Ledley, supra,* 138 *N.J.* at 636, 651 *A.2d* 92 (internal quotation marks and citation omitted).

## C.

Our Rules of Court explicitly authorize attorneys to "engage in the practice of law as limited liability partnerships in the same manner as an individual or a partnership may engage in the practice of law[.]" *R.* 1:21–1C(a). We adopted that rule in 1997 after considering recommendations of a Court-appointed commit-

tee formed "to consider whether attorneys should be permitted to practice law in [that] form[.]" *Report of the Supreme Court Committee on the Practice of Law by Limited Liability Companies and Limited Liability Partnerships* at 1 (June 1996) (*Report*). The committee "concluded that attorneys should be permitted to use these business forms subject to certain conditions." *Ibid.* Consistent with that conclusion, the rule provides that "[a]ll provisions of the Uniform Partnership Act, *N.J.S.A.* 42:1–1 through 49, shall be complied with, except where inconsistent with these rules." *R.* 1:21–1C(a)(1).

We take this occasion to correct a minor textual error. Although it refers to the "Uniform Partnership Act," the rule cites "*N.J.S.A.* 42:1–1 through 49," which actually is the citation for the Uniform Partnership Law. As originally adopted, the rule should have referred to the Uniform Partnership *Law,* not to the *Act.* See *Report* at 2, 14 (referring to Uniform Partnership *Law* as basis of rule). The error at this juncture is academic because, as already noted, the Legislature has repealed and replaced the Law with the Act pursuant to *L.* 2000, *c.* 161. See Pressler, *Current N.J. Court Rules,* comment on *R.* 1:21–1C (2003) (describing rule's history and instructing that Act now is in effect).

One of the committee's recommended conditions, namely, that limited liability partnerships carry adequate insurance, is codified in subsection (a)(3). A critical component of the rule, that provision mandates that

> [t]he limited liability partnership shall obtain and maintain in good standing one or more policies of lawyers' professional liability insurance which shall insure the limited liability partnership against liability imposed upon it by law for damages resulting from any claim made against the limited liability partnership by its clients arising out of the performance of professional services by attorneys employed by the limited liability partnership in their capacities as attorneys.
>
> [*R.* 1:21–1C(a)(3).]

The rule specifies the minimum insurance coverage required. *Ibid.* It also mandates that limited liability partnerships file with the Clerk of this Court "a certificate of insurance, issued by the insurer, setting forth the name and address of the insurance

company writing the insurance policies required by paragraph (a)(3) of this rule and the policy number and policy limits." *R.* 1:21–1C(b). Additionally, the rule requires firms to file with the Clerk any "[a]mendments to and renewals of the certificate of insurance ... within 30 days after the date on which such amendments or renewals become effective." *Ibid.*

The above requirements are grounded in this Court's constitutional authority to regulate the legal profession. See *N.J. Const.* Art. VI, § 2, ¶ 3 (providing that "Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted"). They encapsulate the same competing interests that are at stake in this appeal. On the one hand, *Rule* 1:21–1C provides attorneys the opportunity to practice in a chosen entity that includes limited liability for its members. On the other, it seeks to protect consumers of legal services from attorney malpractice by requiring such entities to maintain adequate insurance. The rule's requirement that limited liability partnerships file an initial and any updated certificates of insurance with the Clerk of the Court is consistent with those objectives. At bottom, the rule helps to limit the public's exposure to uninsured risks arising from the receipt of legal services in this State.

## III.

In applying the foregoing tenets, our threshold inquiry focuses on Wheeler's responses recorded on the insurance application form and his statements contained in the two warranties. Wheeler obviously knew that his April 30, 1998, warranty was false based on his own conduct in engaging in the unauthorized practice of law and in misappropriating client funds in concert with Lawson. Further, on January 22, 1999, with knowledge of his and Lawson's defalcations and with presumed knowledge of the impending OAE audit, Wheeler executed a new warranty. It falsely represents that he was "not aware of any circumstances or any

allegations or contentions as to any incident, which may result in a claim being made against the firm or any of its ... partners[.]"

Under those circumstances, the Appellate Division correctly found "that no reasonable factfinder could conclude anything other than that Wheeler knew his [answers and statements] to be false." *First American, supra,* 351 *N.J.Super.* at 420, 798 *A.*2d 661. We also agree that the other prongs of the equitable-fraud test have been satisfied insofar as Wheeler is concerned.

> [T]here [is no] question, in our view, that Wheeler's failure to disclose constituted a material misrepresentation, as found by the trial judge himself, and one that was detrimentally relied upon by [Underwriters]. It seems clear that the very nature of the omission was such as to "naturally and reasonably influence the judgment of the underwriter in making the contract at all, or in estimating the degree or character of the risk, or in fixing the rate of the premium." It is equally clear that [Underwriters] would not have subscribed to the policy had Wheeler's criminal and fraudulent activities been known.
>
> [*Id.* at 420, 798 A.2d 661 (internal citations omitted).]

The thornier question concerns whether and to what extent Wheeler's misrepresentations should result in a forfeiture of coverage. Resolution of that question requires four distinct inquiries: whether coverage should be rescinded in respect of (1) Wheeler, (2) Lawson, (3) the firm as an entity, and (4) Snyder. We will address each inquiry separately and in that order.

We have no difficulty discerning the consequences of Wheeler's misrepresentations in respect of Wheeler himself. Our case law provides Underwriters with the clear right to rescind Wheeler's coverage in the face of his blatant and direct misrepresentations. We disagree with the title insurers that the exclusive remedy for such fraud is cancellation of the policy that would take effect only prospectively. As the Appellate Division properly observed, rescission is an equitable remedy that "operates as a matter of law, not contract. It lies within the inherent discretion of the court." *Id.* at 423, 798 A.2d 661. We therefore conclude that Wheeler's misconduct entitles Underwriters to consider the policy void insofar as that individual is concerned.

■ Similarly, the carrier is entitled to rescind coverage in respect of Lawson. Lawson's role in furnishing the misinformation to Underwriters is not as clear or direct as Wheeler's role. Lawson's conduct in misappropriating client funds, however, was so intertwined with that of Wheeler's, that we are left with the unmistakable conclusion that Lawson knew or should have known that the forms submitted to the carrier contained false or misleading information. *Cf. Palisades Safety & Ins. Ass'n v. Bastien*, 175 *N.J.* 144, 151, 814 *A*.2d 619 (2003) (holding that husband's material misrepresentation to carrier voided wife's personal injury protection (PIP) benefits in part because she had occupied "unique position to be aware of" husband's actions). There are no questions concerning either Lawson or Wheeler for a jury to resolve; thus, the policy is void in respect of both individuals.

■ We next consider whether Underwriters is entitled to rescind coverage in respect of the firm as an entity. There, the analysis is not as straightforward. One complicating factor is that prior New Jersey cases that have permitted rescission have concerned individual insureds, or sole-practitioner entities, rather than multi-person firms like the entity in this case. *See, e.g., Gallagher v. New England Mut. Life Ins. Co. of Boston*, 19 *N.J.* 14, 114 *A.*2d 857 (1955) (concerning two life insurance policies); *Liebling, supra*, 337 *N.J.Super.* 447, 767 *A.*2d 515 (pertaining to sole legal practitioner); *Booker v. Blackburn*, 942 *F.Supp.* 1005 (D.N.J.1996) (focusing on professional-liability insurance for single-member engineering firm).

We are persuaded that we should extend the holding of those cases to the firm as a whole. Because he was the firm's managing partner, Wheeler occupied a special status as the person chiefly responsible for the application process. Permitting the firm's coverage to survive Wheeler's defalcations would, in essence, condone the use of a partnership entity as a subterfuge for fraudulent conduct. This is not a case in which a lone attorney in a multi-person firm knowingly had supplied the managing partner with false information that the partner merely forwarded to the

carrier without knowledge of its falsity. Rather, two of the firm's three partners had engaged in wrongful conduct and the managing partner, himself a wrongdoer, had concealed that conduct when applying for the firm's policy. On those facts, the carrier is entitled to rescind its coverage of the firm as an entity.

The remaining issue concerning Snyder's coverage is the most difficult. Many of the same concepts that support voiding the policy in respect of Wheeler, Lawson, and the firm as a whole also support voiding it in respect of Snyder. Snyder, however, in no way participated in the fraudulent conduct of his fellow partners. Lawson testified that Snyder did not engage in any misappropriation and had no knowledge of any improprieties or that the firm was foundering. Further, Lawson did not inform Snyder of the grievances filed with the OAE or that the OAE had demanded an audit. Snyder also was a distant partner in the sense that he did not share offices with Lawson and Wheeler, but instead conducted his practice in a separate Manhattan office that he alone maintained. Because he did not issue checks from the firm's New Jersey accounts, Snyder presumably was unfamiliar with the firm's trust-account ledger or with similar records that Wheeler maintained as managing partner.

Those facts require us to consider Snyder an innocent partner for purposes of balancing the equities attendant in these circumstances. Further, by organizing the firm as a limited liability partnership, Snyder had every reason to expect that his exposure to liability would be circumscribed in accordance with the Uniform Partnership Law. Stated differently, voiding Snyder's coverage solely because of his partners' wrongful conduct potentially would expose Snyder to uninsured liability in a manner inconsistent with his expectations under the UPL. (We express no opinion regarding Snyder's actual liability to any party, or regarding whether any allegation against Snyder is excluded from coverage in accordance with the policy's contractual terms. Our sole task is to determine whether the policy itself is void as a matter of law as applied to Snyder.)

Moreover, voiding the policy in respect of Snyder would mean that he no longer would possess coverage for any of his actions in unrelated matters, including simple malpractice, that might have occurred during the period of anticipated coverage. Thus, applying the rule of law advocated by Underwriters could leave members of the public, whom Snyder had represented throughout that period, unprotected even though the insured himself committed no fraud. In our view, that harsh and sweeping result would be contrary to the public interest. More specifically, it would be inconsistent with the policies underlying our Rules of Court that seek to protect consumers of legal services by requiring attorneys to maintain adequate insurance in this setting. *Cf. Fisher v. New Jersey Auto. Full Ins. Underwriting Ass'n*, 224 *N.J.Super.* 552, 557–58, 540 *A.2d* 1344 (App.Div.1988) (allowing PIP benefits for innocent third parties even when underlying insurance policy otherwise is void due to policyholder's misrepresentations).

We thus conclude that the equities do not warrant rescission of Snyder's coverage. We reiterate that our holding is confined solely to that narrow legal question. The Court does not suggest an opinion in respect of the scope of that coverage or any other issue as it might relate to the policy's existence insofar as Snyder is concerned. Understandably, the Appellate Division found no need to review any question regarding Snyder given its original disposition. Accordingly, we remand the matter to the Appellate Division to consider any issue that it might deem appropriate for resolution in view of this opinion.

 Lastly, we acknowledge that rescinding the policy in respect of Lawson, Wheeler, and the firm as an entity, but not in respect of Snyder, encompasses a certain degree of line drawing. Unlike the dissent, however, we are convinced that our disposition is consistent with rescission as an equitable remedy, which properly depends on the totality of circumstances in a given case and resides within a court's discretion. See *Intertech Assocs., Inc. v. City of Paterson*, 255 *N.J.Super.* 52, 59, 604 *A.2d* 628 (App.Div. 1992) (observing that "[e]ven where grounds for rescission exist

... the remedy is discretionary"). Here, those circumstances include our concern for the public, which distinguishes this matter from the more typical contract case. As the trial court succinctly observed: "Equitable relief does not mean automatic relief." We view the underlying policy as being sufficiently divisible in respect of each individual partner so that partial rescission is a permissible remedy on the facts before us. Thus, to the extent that we have drawn certain boundaries in disposing of this appeal, the competing equities have required it. As for future disputes, we do not share the dissent's optimism that innocent attorneys and consumers of legal services would be adequately protected absent our carefully designed holding.

## IV.

The judgment of the Appellate Division is affirmed in part and reversed in part. The matter is remanded to that court to consider those issues, if any, that it might deem appropriate for resolution consistent with this opinion. We do not retain jurisdiction.

LaVECCHIA, J., dissenting.

I would affirm the Appellate Division decision for the reasons expressed in the persuasive opinion authored by Judge Parrillo. I add only the following comments.

Distilled, this case is about whether plaintiff title insurers must bear full responsibility on a risk those companies, in fact, agreed to insure or whether their respective liabilities may be lightened by requiring a malpractice insurer to provide coverage under a policy it would not have issued but for the insured's misrepresentations in its application. I am loath to join a result that could be perceived as tolerating fraudulent procurement of insurance. The majority grants what amounts to partial rescission of a professional liability policy that, in my view, should be deemed void *ab initio* as procured based on fraudulent representations. Allowing coverage for even one of the three attorneys comprising the law firm

that misrepresented on the application for insurance ignores the critical fact that the insurer never would have issued a policy covering the firm and its partners but for the deceit of one partner (who stole money from clients), the complicity of a second partner, and the indifference of a third partner.

Rescission is appropriate where a material misrepresentation is made with the intent that it will be relied upon, and the misrepresentation is, in fact, relied upon to one's detriment. *Jewish Ctr. of Sussex County v. Whale,* 86 *N.J.* 619, 624–25, 432 *A.2d* 521 (1981); 2 *Couch on Insurance* § 31:81 (3d ed. 1995 & Supp.2003). Although that is precisely what happened in this case, the majority stops short of rescinding the entire insurance policy, as would normally occur when a contract of insurance is declared void *ab initio,* and instead orders partial rescission of the contract. See *Mass. Mun. Wholesale Elec. Co. v. Town of Danvers,* 411 *Mass.* 39, 577 *N.E.2d* 283, 292–93 (1991) (stating general rule that "[a] contract which is void ab initio, or void from the beginning, may not be enforced" and noting that "[j]udicial or equitable doctrines cannot breathe life into such a contract" given that "courts treat the contract as if it had never been made"); *see also Remsden v. Dependable Ins. Co.,* 71 *N.J.* 587, 589, 367 *A.2d* 421 (1976) (stating material misrepresentations in application justify rescission of policy *ab initio* ).

It is generally accepted that partial rescission is appropriate as a remedy only where a contract is divisible, the basis for rescission does not affect the whole contract, and the facts of a case warrant such relief. 2 *Couch on Insurance, supra,* § 31:69; *see also County of Morris v. Fauver,* 153 *N.J.* 80, 97, 707 *A.2d* 958 (1998) (stating "[o]nly where a contract is severable into different transactions may one of those separate transactions be avoided"); *Bonnco Petrol, Inc. v. Epstein,* 115 *N.J.* 599, 612, 560 *A.2d* 655 (1989) (acknowledging rule that "a contract is not to be partially rescinded"). This case does not present an opportunity for application of partial rescission, however seductive that result may be. We do not have a divisible contract. The subject policy covered a

law firm comprised of three partners. The misrepresentations concerning potential professional liability claims, made during the application process, were made on behalf of the entire firm. That three attorneys, acting on behalf of the firm, were insured under the policy does not render the policy divisible into different transactions.

Even if the policy were divisible as to each named insured, total rescission is still warranted where the fraud goes to procurement of the entire contract. 2 *Couch on Insurance, supra*, § 31:68 (stating that "the ground for rescission may be such as to affect the validity of all parts of the contract, whether divisible or not, in which case a decree rescinding the entire contract is of course proper"). *Cf. ibid.* (noting that "where two policies are issued upon a single application which is fraudulent, both policies may be rescinded"). The basis for rescission here—material misrepresentations concerning potential claims on the *application* for a claims-made professional liability insurance policy—most assuredly affected the validity of the entire contract. *Accord Home Indem. Co. v. Toombs*, 910 *F.Supp.* 1569 (N.D.Ga.1995) (rescinding legal malpractice policy as to entire firm based on material misrepresentation in application).

As an inherently discretionary remedy, rescission is awarded on a case-by-case basis. *Intertech Assocs., Inc. v. City of Paterson*, 255 *N.J.Super.* 52, 59, 604 *A.2d* 628 (App.Div.1992). I leave for another day whether equity would not allow rescission of professional liability insurance policies in other settings. Query whether rescission would be allowed where a partner in a firm was guilty of malfeasance and successfully concealed his misdeeds from other partners who were responsible for procuring insurance and who undertook to inform themselves generally about the firm's work, including the safeguarding of client trust fund accounts. There, and in other settings, the equities might be poised differently than they are here. I trust that in future cases the fact-sensitive equitable analysis required for rescission would protect the overwhelming majority of conscientious law firms and attorneys li-

censed to practice in this State. But traditional rules of contract rescission do not support the partial rescission that the majority orders here. The Appellate Division rightly concluded that this is a classic case for rescinding coverage in favor of the defrauded insurance company.

For affirmance in part; reversal in part; remandment—Chief Justice PORITZ and Justices COLEMAN, LONG, VERNIERO, ZAZZALI and ALBIN—6.

For affirmance—Justice LaVECCHIA—1.