**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2322-21

CHERYL SAUSELEIN-RACZ,

    Plaintiff-Appellant,

v.

NEW JERSEY MANUFACTURERS
INSURANCE COMPANY,

    Defendant-Respondent.

_____

Argued September 20, 2023 – Decided November 17, 2023

Before Judges Vernoia and Walcott-Henderson.

On appeal from the Superior Court of New Jersey,
Law Division, Cape May County, Docket No.
L-0121-20.

Robert Alan Berns argued the cause for appellant
(Kaufman Dolowich & Voluck, LLP, attorneys; Robert
Alan Berns and Timothy Mark Ortolani, of counsel and
on the briefs).

Glenn Thomas Dyer argued the cause for the
respondent (Dyer & Peterson, PC, attorneys; Glen
Thomas Dyer, on the brief).

PER CURIAM

In this insurance dispute over Underinsured Motorist (UIM) coverage, plaintiff Cheryl Sauselein-Racz appeals from an order granting defendant New Jersey Manufacturer's Insurance Company (NJM) summary judgment dismissing plaintiff's declaratory judgment action. Having considered whether plaintiff's obligation to notify NJM about her personal injury lawsuit under Ferrante v. New Jersey Mfrs. Ins. Grp., 232 N.J. 460 (2018), was obviated by NJM's rescission of plaintiff's policy, we conclude plaintiff's actions resulted in the irretrievable loss of NJM's subrogation rights and forfeiture of her UIM coverage. We therefore affirm.

The relevant facts are undisputed. On March 27, 2018, while driving her husband and son, plaintiff was involved in a head-on collision automobile accident with Mary Waddell's vehicle. Following the accident, plaintiff and her family were transported to Cape Regional Medical Center, where they were treated for injuries of varying degrees of severity.

Meanwhile, at the scene of the accident, Waddell admitted to officers that she was operating her vehicle after taking Methadone, and she subsequently failed a sobriety test. Waddell was ticketed for reckless driving in violation of N.J.S.A. 39:4-96, among other offenses.

A-2322-21

At the time of the accident, plaintiff and her husband, having carried insurance with NJM since at least 2013, were insured under a one-year NJM policy, effective July 15, 2017, through July 15, 2018. According to plaintiff, that one-year NJM policy provided $300,000.00 in uninsured/underinsured motorist coverage (UM/UIM), as well as $250,000.00 in personal injury protection (PIP) benefits.

Notably, the UM/UIM endorsement section of the policy provides that a UIM claimant must "promptly . . . send [NJM] copies of the legal papers if a suit is brought," and "notify [NJM] in writing of a tentative settlement" with the carrier for the underinsured motor vehicle and permit NJM thirty days to pay the amount "equal to the tentative settlement" in order "to preserve [its] rights against the insurer, owner or operator of such underinsured motor vehicle."

The "General Provisions" section of the policy states that if NJM makes a payment under the policy to a claimant who has the right to recover damages from another, NJM shall be subrogated to that right. In that case, the policy requires the claimant to do "[w]hatever is necessary to enable [NJM] to exercise [its] rights" and "[n]othing after loss to prejudice them." The subrogation rights outlined in that section do not apply if NJM has been given "prompt written notice of a tentative settlement" between the insured and the underinsured

3

tortfeasor's carrier and NJM "failed to advance payment to the insured in an amount equal to the tentative settlement within [thirty] days" after receiving such notification.

On June 21, 2018, approximately three months after the accident, plaintiff and her husband filed a personal injury suit against Waddell in Cape May County. Waddell filed an answer to that complaint on July 24, 2018. After exchanging discovery, plaintiff and her husband learned that Waddell's automobile liability coverage limit was $100,000.00.

On October 18, 2018, plaintiff filed a declaratory judgment against NJM in Atlantic County—rather than Cape May—seeking payment of PIP benefits for all past and future medical bills related to the accident. Plaintiff's filing made no reference to her pending personal injury action in Cape May County against Waddell.

On December 11, 2018, plaintiff's counsel filed a $100,000.00 offer of judgment against Waddell. Shortly thereafter, on January 29, 2019, the personal injury lawsuit settled for $95,000.00—nearly the full amount of coverage under the policy held by Waddell at the time of the motor vehicle accident.

Contrary to the UM/UIM endorsement and General Provisions sections of her NJM policy, plaintiff did not notify NJM that she had filed a personal injury

4

action against Waddell and did not provide NJM with a copy of the complaint. Plaintiff also did not advise NJM of Waddell's liability coverage limits, that the Waddell's liability coverage was insufficient to satisfy her personal injury claims, or of the impending settlement.

On December 10, 2018, NJM notified plaintiff and her husband, via letter, of the retroactive rescission of their automobile policy. Specifically, NJM advised that it rescinded the policy because of plaintiff's failure to report that her son was a New Jersey licensed driver residing in their home. NJM informed plaintiff of the following:

> The Personal Automobile Policy is hereby rescinded. Accordingly, all coverage under the contract is considered null and void, effective July 15, 2013.
>
> This action has been influenced by information obtained through the investigation of the accident that occurred on March 27, 2018. Our Special Investigation Unit has determined that a material misrepresentation has been committed surrounding your failure to disclose, at the appropriate time, that Christopher Sauselein was a licensed resident of your household[.]
>
> As a result of the rescission, you have not been provided automobile insurance with [NJM] since July 15, 2013. You must make other insurance arrangements immediately.
>
> Our Claims Department will be advised of the rescission by copy of this letter.

5

> Any return premium will be refunded to you under separate cover.

NJM sent another letter dated December 12, 2018, advising plaintiff and her husband what its investigation revealed, confirming its recission of the policy, and explaining that:

> [they had] engaged in activity that has resulted in [NJM's] rescinding [their] personal auto policy. The rescission has an effective date of July 5, 2013. Accordingly, the NJM policy at issue was not in force on the March 27, 2018 date of loss. As such, any coverage potentially available to you is void.
>
> . . . .
>
> Furthermore, the grounds for our coverage position set forth in this letter are not intended to limit NJM's right to assert additional grounds for disclaiming coverage or all or part of the claim.

NJM issued a $14,548.43 check to plaintiff and her husband, as a refund of plaintiff's annual premium payments made from 2013 to 2018. The period covered by the retroactive rescission of plaintiff's automobile insurance policy included the date of plaintiff's automobile accident with Waddell, the effect of which voided "any coverage available to [plaintiff]" for that accident.

As part of her settlement of her lawsuit against Waddell, on January 8, 2019, plaintiff executed a general release of claims against Waddell and a stipulation of dismissal with prejudice. On January 29, 2019, the court filed the

6

stipulation of dismissal concluding plaintiff's personal injury action against Waddell, who died one year later. Prior to the settlement of her claims against Waddell and delivery of the general release in Waddell's favor, plaintiff had never advised NJM about that lawsuit, settlement, or general release of claims.

On February 15, 2019, NJM filed an answer, counterclaim and third-party complaint for declaratory judgment and Insurance Fraud Prevention Act relief in the Atlantic County PIP action. Thereafter, the parties exchanged discovery. On November 22, 2019, NJM filed a motion for summary judgment, which was denied on December 18, 2019.

On February 19, 2020, the parties advised the court that plaintiff's claims and complaint against NJM had settled. Thereafter, in a stipulation finalized on May 28, 2020, the parties laid out the material terms of the settlement, agreeing in pertinent part that: "NJM shall adjust claims for unpaid PIP . . . for treatment related to injuries sustained in an accident of March 27, 2018, including any bills paid by a medical insurance company subject to $250,000.00 policy limits, deductible, co-payment, and any and all other defenses not raised in this lawsuit." Furthermore, under the stipulation, plaintiff was permitted to seek up to $200,000.00 in UIM benefits under the policy that NJM had rescinded in December 2018. The stipulation effectively canceled the rescission and restored

A-2322-21

the policy that was in effect at the time of the accident, and plaintiff returned to NJM the premium refund check they had issued at the time of the recission in December 2018.

Critically, under the settlement, NJM maintained its right to "assert any and all defenses to the UIM claim of [plaintiff] including but not limited to whether she properly protected NJM's subrogation rights and afforded required notice and/or whether she abided by the mandates set forth in Zirger,[1] Longworth[2] and other decisional authority; in connection with her claim."

Within days of signing the stipulation of settlement, on June 1, 2020, plaintiff filed a second action seeking a declaratory judgment that she is entitled to UIM coverage under the policy NJM had rescinded in 2018.

On February 4, 2022, the parties appeared before Judge Michael Winkelstein for oral argument on plaintiff's motion and NJM's cross-motion for summary judgment. On February 17, 2022, Judge Winkelstein, in an oral decision, granted summary judgment to NJM, finding plaintiff's failure to notify her insurance carrier of her personal injury lawsuit and settlement violated the terms of NJM's insurance policy and the principles established in Longworth.

---

[1] Zirger v. Gen. Accident Ins. Co., 144 N.J. 327 (1996).

[2] Longworth v. Van Houten, 223 N.J. Super. 174 (App. Div. 1988).

A-2322-21

In a well-reasoned analysis of the law and facts, the court concluded that "it was the insured's duty . . . to notify [NJM] in sufficient time to allow [it] to take action in the personal injury lawsuit" and that [NJM's] actions were in complete accord "with the Supreme Court's directives" in Ferrante. The court further found "plaintiff's actions . . . caused NJM to forfeit its subrogation rights" and NJM was "entitled to summary judgment precluding [p]laintiff from receiving UIM benefits under the policy." On the issue of whether NJM was prejudiced by plaintiff's failure to provide it with notice of the lawsuit against Waddell, the court concluded that, consistent with the Court's holding in Ferrante, a showing of "prejudice upon the loss of subrogation rights is not a prerequisite" to void a claim for UIM benefits.

This appeal followed.

## I.

We review a grant of summary judgment de novo, Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021), "under the same standard that govern[ed] the court's determination," Goldhagen v. Pasmowitz, 247 N.J. 580, 593 (2021). We "must 'consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the

non-moving party.'" Meade v. Twp. of Livingston, 249 N.J. 310, 327 (2021) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)). "Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

However, we give no deference to a trial court's legal determinations when no issue of fact exist. Templo Fuente De Vida Corp. v. National Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

The relationship between an insured and an insurance carrier is contractual; the obligation to offer UIM coverage, however, is statutory. Zirger v. Gen. Accident Ins. Co., 144 N.J. at 333. Insurance carriers are required to offer each insured the option of purchasing UM/UIM coverage up to the limits of liability coverage, but not exceeding $250,000.00 per person and $500,000.00 per accident against the risk of injury caused by underinsured tortfeasors. N.J.S.A. 17:28-1.1(b). An individual against whom recovery is sought after an accident is considered "underinsured" when his or her liability limits are "at the

time of the accident, less than the applicable limits for underinsured motorist coverage afforded under the motor vehicle insurance policy held by the person seeking that recovery." N.J.S.A. 17:28-1.1(e)(1).

A UIM carrier who pays benefits to an insured has the right to subrogate the insured's claim against the tortfeasor to permit the carrier to recover from the tortfeasor the UIM benefits paid to its insured. To effectuate this right, "a UIM carrier may intervene in an insured's trial against a tortfeasor" to avoid "relitigating the insured's claim, and to bind the tortfeasor to the issues decided at trial." Zirger, 144 N.J. at 340-42.

In Longworth, we announced a notification procedure for insureds and insurers to follow when making UIM claims. 223 N.J. Super. at 185. The court observed:

> [A]n insured receiving an acceptable settlement offer from the tortfeasor should notify his UIM carrier. The carrier may then promptly offer its insured that sum in exchange for assignment to it by the insured of the claim against the tortfeasor. While promptness is to be ultimately determined by the circumstances, [thirty] days should be regarded as the presumptive time period if the insured notices his carrier prior to assignment of a trial date.
>
> [Id. at 194.]

Subsequently, our Supreme Court endorsed that procedure in <u>Rutgers Cas.</u> <u>Ins. Co. v. Vassas</u>, 139 N.J. 163, 169 (1995). In <u>Vassas</u>, the insured pursued a claim against his insurer for UIM benefits three years after an accident. <u>Id.</u> at 166. By that time, the insured had sued the tortfeasor, gone to arbitration, accepted an arbitration award significantly below the UIM limits, reduced the award to judgment, and executed a warrant of satisfaction to the tortfeasor. <u>Ibid.</u> As the limitations period for a subrogation action against the tortfeasor was the same two-year period that governed the insured's suit against the tortfeasor, any possible subrogation action taken by the insurer was time-barred. <u>Id.</u> at 169-70.

Addressing our holding in <u>Longworth</u>, the Court identified three occasions when the insured must notify the UIM carrier:

> (1) when [an insured under an automobile insurance policy providing UIM benefits is involved in an accident and undertakes] legal action against the tortfeasor; (2) [i]f, during the pendency of the claim, the tortfeasor's insurance coverage proves insufficient to satisfy the insured's damages; and (3) if the insured is seeking UIM benefits because he or she "receive[d] a settlement offer or arbitration award that does not completely satisfy the claim, because the tortfeasor is underinsured."
>
> [<u>Ferrante</u>, 232 N.J. at 471 (quoting <u>Vassas</u>, 139 N.J. at 174).]

In Ferrante, our Supreme Court also considered whether a finding of prejudice was required to void a UIM claim where the insurer's subrogation rights were totally nullified by the insured's conduct. 232 N.J. at 471. There, the insured failed to notify his insurer that he was prosecuting a personal injury lawsuit against the tortfeasor until after the insurer waived its subrogation rights. Id. at 463. By that time, the insured had participated in arbitration, gone to trial, executed a high-low agreement for $100,000.00, and obtained a jury award of $250,000.00. Id. at 465-66. The insurer subsequently moved to bar the plaintiff's UIM claim because he effectively forfeited the insurer's subrogation rights and failed to comply with the notification requirements under his policy. Ibid.

Although the Vassas Court held the insured's failure to comply with the provisions of his insurance contract "bar[red] his action to recover UIM benefits from [his insurer]" and the insured "unfairly prejudiced [the insurer's] subrogation right against [the tortfeasor]" contrary to the requirements of his insurance policy, 139 N.J. at 165, 176, Ferrante held that prejudice to the UIM carrier need not be weighed in the analysis of whether a UIM claim is barred where an insured "could have, should have, but did not" notify the carrier as required under Longworth. 232 N.J. at 474. The Court reasoned that an

13

insured's "duty to notify in the UIM context is intended to protect a carrier's right of subrogation." Ibid. The Court concluded the plaintiff violated that duty by failing to notify his UIM carrier of the lawsuit, the high-low agreement, and the jury trial. Id. at 473.

In Rivers v. Allstate Ins. Co., 312 N.J. Super. 379 (App. Div. 1998), we addressed the consequences of the insured's failure to follow Vassas. In Rivers, the insured notified her UIM carrier that she had filed suit against the tortfeasor, which satisfied the first two notice requirements established in Vassas, but she executed a general release in favor of the tortfeasor without sending her UIM carrier a Longworth notice or securing the carrier's permission to do so. Id. at 381, 383-84. The insured also sent a letter to the carrier falsely stating the tortfeasor had offered to settle the matter and it was the insured's "intention" to accept the settlement, when the insured had already signed a release and received the settlement proceeds. Id. at 384. The court determined plaintiff's notice to the carrier failed to comport with the requirements set forth in Longworth, and the insured's failure to disclose necessary information regarding the general release effectively extinguished the insurer's subrogation rights. Ibid. The court also determined that, as a result, the insured was barred from pursuing her UIM claim.

A-2322-21

Measured against the foregoing principles, we conclude that plaintiff's UIM claim is barred because of her failure to inform NJM of the commencement of her suit against Waddell prior to NJM's recission of the policy, and plaintiff's failure to notify NJM of the subsequent settlement and execution of the general release in Waddell's favor because plaintiff's actions resulted in the irretrievable loss of NJM's subrogation rights.

## II.

Racz argues her duty to inform NJM of her claim and settlement were extinguished by NJM's rescission of her policy; rendering her insurance policy void ab initio and thus relieving her of any Longworth duty. In support of the contention, plaintiff relies on the general contract law principle that "[r]escission voids [a] contract ab initio," meaning that it is considered "null from the beginning" and it is treated as if it does not exist for any purpose. First Am. Title Ins. Co. v. Lawson, 177 N.J. 125, 137 (2003).

NJM contends that "plaintiff's claim for UIM benefits is barred as a matter of law by virtue of her failure to abide by both the policy provisions and common law . . . ." Relying upon Ferrante, NJM maintains that "[w]hat plaintiff was surely required to do was simply notify [it] of her pending lawsuit, her intention to pursue UIM coverage, the settlement offer and her intent to accept the offer

before signing the general release, dismissing that action and pursuing this action."

We reject plaintiff's claim because her obligation to inform NJM of her pending lawsuit against the tortfeasor arose prior to NJM's putative recission of the policy by over five months. More particularly, plaintiff filed her lawsuit against Waddell in June 2018, but failed to inform NJM she had done so. In October 2018, plaintiff filed her action against NJM seeking enforcement of what she claimed was NJM's obligation under the policy to pay PIP. That is, plaintiff's claim against NJM was based on her contention she had enforceable contract rights under the NJM policy.

During the pendency of that litigation, in which plaintiff prosecuted her claim the NJM policy was valid and binding, plaintiff never informed NJM of the pendency of the Waddell lawsuit. Also, during the pendency of her lawsuit against NJM, plaintiff made an offer of judgment to Waddell, settled her claims against Waddell, and executed a release in favor of Waddell that ended any potential rights of subrogation NJM would have enjoyed had plaintiff provided a proper Longworth notice to it.

Plaintiff's prosecution of her claims against NJM for PIP benefits is inconsistent with her contention that NJM's December 2018 attempt at

rescinding the insurance policy relieved her of the obligation to comply with her obligations under <u>Longworth</u>. Plaintiff cannot logically claim she relied on NJM's recission letter as the basis for her failure to comply with <u>Longworth</u>'s requirements when her position at all times, including after she received the notice of rescission, was that the policy was in full force and effect at the time of her accident with Waddell and, as such, NJM was obligated under the policy to pay her PIP benefits.

Under those circumstances, it is incongruous for plaintiff to argue, as she does here, that despite NJM's effort to retroactively rescind the policy, she was entitled to coverage under it when the Waddell accident occurred but she was relieved of her legal duty under <u>Longworth</u> to notify NJM of her pending lawsuit against Waddell and its settlement. And, plaintiff proved to be correct about NJM's effort to retroactively rescind the policy—the resolution of her lawsuit against NJM allowed her to recover PIP benefits under the policy and to pursue her claims against NJM for UIM coverage. For those reasons, we are convinced plaintiff's reliance on NJM's effort to rescind the policy provides no refuge from her failure to comply with her <u>Longworth</u> obligations.

A-2322-21

Plaintiff also contends the Court's holding in <u>Ferrante</u> inherently includes a "prejudice[-]to[-]the[-]insurer" analysis and that the court erred in not considering the tortfeasor's destitute status in this case. Plaintiff argues the lack of notice to NJM of the personal injury lawsuit and settlement was thus an immaterial breach, and the court committed reversable error in not finding NJM's missed opportunity to determine subrogation was in fact illusory.

On this, the parties dispute whether <u>Ferrante</u> created a bright-line rule requiring an insured to advise the insurer of a liability claim settlement offer and intention to pursue UIM coverage claims, and if as NJM suggested in <u>Ferrante</u>, stands for the proposition that the presumption of prejudice is rebuttable in every case.

Given our earlier interpretation of <u>Ferrante</u>, we are unpersuaded by plaintiff's argument that NJM's ability to collect from the tortfeasor was a "key issue" the court failed to consider. NJM was not obliged to show it suffered prejudice, and the fact that it failed to do so is of no consequence. As ratified by <u>Ferrante</u> Court:

> If . . . the insured, regardless of his state of mind, fails
> to give the UIM carrier <u>any</u> notice of the UIM claim
> until after the final resolution of the underlying tort
> action, thereby causing the irretrievable loss of the

carrier's rights to subrogation and intervention before the carrier has ever learned of the existence of the claim, coverage is forfeited.

[Ferrante, 232 N.J. at 474.]

We therefore conclude plaintiff's action, in failing to notify NJM of any aspect of her legal action against the tortfeasor—its filing and eventual settlement—contrary to the requirements of her policy and legal precedent, caused the irretrievable loss of NJM's subrogation rights. Ibid.; see also Longworth, 223 N.J. Super. at 194–95.

Consequently, we need not address whether Sauselein-Racz established a lack of prejudice, based on her contention that a subrogation action, would have yielded de minimis results. See R. 2:11-3(e)(1)(E).

Affirm.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION