12 A.3d 719 (2011)
418 N.J. Super. 162
OHIO CASUALTY INSURANCE COMPANY, Plaintiff-Appellant,
v.
ISLAND POOL & SPA, INC., Defendant-Respondent.
No. A-3216-09T2.
Superior Court of New Jersey, Appellate Division.
Submitted January 4, 2011.
Decided February 9, 2011.
*720 McElroy, Deutsch, Mulvaney & Carpenter, LLP, attorneys for appellant (John T. Coyne, Morristown, on the briefs).
Michael J. Breslin, Jr., attorney for respondent.
Before Judges PAYNE, BAXTER and KOBLITZ.
The opinion of the court was delivered by
BAXTER, J.A.D.
In this insurance coverage dispute, plaintiff Ohio Casualty Insurance Company (Ohio Casualty) appeals from a January 8, 2010 Law Division order requiring Ohio Casualty to provide coverage to defendant Island Pool & Spa, Inc. (Island Pool) under a Comprehensive General Liability (CGL) policy Island Pool had purchased.[1] Ohio *721 Casualty also appeals from a January 28, 2010 Law Division order awarding attorney's fees of $16,831 to Island Pool. We agree with Ohio Casualty's contention that the judge erred when he rejected its argument that the "ongoing operations" exclusion applied. We reverse both orders and remand for the entry of summary judgment in favor of Ohio Casualty.

I.
Defendant was hired to repaint an in-ground swimming pool at a residence in Tenafly. To perform the repainting project, defendant drained the pool. Once the pool was emptied, defendant installed a temporary pump to prevent subterranean water from exerting upward pressure on the pool. The temporary pump installed by defendant failed during a torrential rainfall on June 3, 2006, and, as a result, the pool lifted out of the ground, cracked and could not be repaired. The incident also caused considerable damage to the adjacent decking and landscaping. Island Pool repaired all of the damage, by constructing a new pool and providing new decking and landscaping, at a total cost of $89,315.65. It submitted these expenses and list of damages to Ohio Casualty and requested coverage and indemnification.
By letter of June 13, 2006, Ohio Casualty notified Island Pool that it was declining coverage for the loss of the pool based upon exclusions j(5) and (6) of the CGL policy. Ohio Casualty did agree, however, to pay $20,075 to replace the landscaping and $11,530 to replace the decking. The carrier agreed to pay the latter expenses because the language of the j(5) exclusion applied only to the "particular part" of the property on which the insured was "performing operations," and because Island Pool was not "performing operations" on the landscaping or decking, the damage to those portions of the homeowners' property was covered by the CGL policy.
The CGL policy issued by Ohio Casualty to Island Pool obligated Ohio Casualty to "pay those sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this insurance applies" (emphasis added). The j(5) exclusion in the CGL policy stated:
This insurance does not apply to:
j. Damage To Property
"Property damage" to:
. . . .
5. That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations.[2]
The term "property damage" is defined in the policy as follows:
a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.
Relying solely on the j(5) exclusion, Ohio Casualty moved for summary judgment, seeking a declaration that it was not obligated to provide coverage to Island Pool *722 for the costs Island Pool incurred in demolishing and replacing the pool. Island Pool cross-moved for summary judgment, seeking a declaration that Ohio Casualty was required to afford coverage and that the j(5) exclusion did not apply. In an oral opinion rendered on December 23, 2009, the judge granted summary judgment in favor of Island Pool, reasoning:
. . . Ohio Casualty's reliance on the exclusion based on the insured's continuing operations is inconsistent and illogical. Ohio Casualty concedes coverage for damage[ ] to the decking and landscaping surrounding the pool, which consists and is defined as real property, which was damaged during the insured's uncompleted painting of the pool. . . . [T]he decking and the landscaping was an essential part . . . and a portion of the real property at the premises.
Turning to a discussion of Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 405 A.2d 788 (1979), the judge observed that, in his view, Ohio Casualty's disclaimer of coverage was based on Weedo and its progeny, which held that an insurer is not obligated to cover a loss that results from its insured's faulty workmanship. The judge then held that Ohio Casualty's reliance on Weedo was misplaced because Ohio Casualty
incorrectly characterizes the pool as the product which was the subject of the faulty workmanship. It was not. . . . Island Pool did not sell or install the pool. It was not hired by the homeowner to repair it. The insured's task was to paint it. The negligence of the insured led to the damage to the pool, the deck and the surrounding landscaping. Said damage to the third-party's property[,] that is, the homeowner[s], was consequential to the negligence of the insured's acts and omissions and is, therefore, covered under the policy.
Island Pool's negligence in painting the pool caused the damage to the pool structure itself. . . . Said damages are consequential damages . . . caused to the real property of [the homeowners], and is, therefore, not affected by the exclusion cited. In my view this ruling is consistent with the holding in Cypreco[3] and Weedo.

The judge also awarded Island Pool counsel fees in the amount of $16,830 pursuant to Rule 4:42-9(a)(6), which authorizes an award of counsel fees to an insured who prevails in an insurance coverage dispute.
On appeal, Ohio Casualty maintains that because there was no dispute about the fact that the damage to the pool occurred while Island Pool's operations were ongoing, exclusion j(5) clearly bars coverage of Island Pool's claim for reimbursement of the cost of demolishing and replacing the pool. It points to decisions of courts in Illinois and Florida that applied the j(5) exclusion on identical facts, American Equity Insurance Co. v. Van Ginhoven, 788 So.2d 388 (Fla.Dist.Ct.App.2001) and Pekin Insurance Co. v. Willett, 301 Ill. App.3d 1034, 235 Ill.Dec. 350, 704 N.E.2d 923 (1999).
Ohio Casualty also argues that the judge was mistaken when he concluded that Ohio Casualty was relying on the principle articulated in Weedo, supra, 81 N.J. at 237, 405 A.2d 788, that contractors are not entitled to coverage of claims for the cost of repairing their own defective workmanship. It points to its statement during oral argument before the Law Division that the *723 present dispute is "not a Weedo situation." Ohio Casualty argued before the Law Division, and argues again before us, that "its position is not based on the Weedo principle, but on entirely distinct policy terms." Therefore, according to Ohio Casualty, the judge erred by relying on Weedo, which was based on a different policy exclusion.
The carrier argues that all it need establish to justify its denial of coverage "is that Island Pool was performing operations on the pool and that those operations were ongoing at the time the damage to the pool occurred." Because neither of those two facts was disputed, the "applicability of exclusion j(5) . . . is clear, and judgment should be entered in Ohio Casualty's favor."
Island Pool, in contrast, argues that: 1) the trial judge's reliance on Weedo was correct; and 2) Island Pool purchased general liability coverage to protect it against the risk of injury from the unforeseen consequences of its activities, which is precisely the harm at issue here, and therefore it is entitled to have its reasonable expectations of coverage satisfied.

II.
In our review of the trial judge's grant of summary judgment, we review the record to determine whether there are material factual disputes and, if not, whether the undisputed facts viewed in the light most favorable to plaintiff nonetheless entitle the moving party to judgment as a matter of law. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995). Because the interpretation of an insurance contract is a question of law, we review the trial judge's coverage determination de novo. Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div.), certif. denied, 154 N.J. 608, 713 A.2d 499 (1998).
"An insurance policy is a contract that will be enforced as written when its terms are clear in order that the expectations of the parties . . . be fulfilled." Flomerfelt v. Cardiello, 202 N.J. 432, 441, 997 A.2d 991 (2010). When interpreting language in an insurance policy, the words used should be given their ordinary meaning. Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175, 607 A.2d 1255 (1992) (citing Longobardi v. Chubb Ins. Co., 121 N.J. 530, 537, 582 A.2d 1257 (1990)). If the language of a particular provision is clear and unambiguous, the inquiry is concluded. Progressive Cas. Ins. Co. v. Hurley, 166 N.J. 260, 272-73, 765 A.2d 195 (2001).
"However, when a policy is unclear[,] ambiguities ordinarily are resolved in favor of the insured." Id. at 273, 765 A.2d 195. Additionally, "where the policy language of an insurance policy supports two meanings, one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied." Ibid. (internal quotation marks and citations omitted).
On the other hand, "we will not search for ambiguities [in insurance policy exclusions] where there are none." Villa v. Short, 195 N.J. 15, 26, 947 A.2d 1217 (2008); President v. Jenkins, 180 N.J. 550, 562, 853 A.2d 247 (2004) (holding that "[i]f the policy terms are clear, courts should interpret the policy as written and avoid writing a better insurance policy than the one purchased"). As the Supreme Court observed:
The language in the policy underscores the basic notion that the premium paid by the insured does not buy coverage for all . . . damage but only for that type of damage provided for in the policy. Thus, limitations on coverage in an insurance policy are designed to restrict and shape coverage otherwise afforded.

*724 [Hardy v. Abdul-Matin, 198 N.J. 95, 102, 965 A.2d 1165 (2009) (internal quotation marks and citations omitted).]
Clearly worded exclusionary clauses in an insurance policy must be enforced as long as they are unambiguous and not contrary to public policy. Ibid.
In Weedo, supra, the seminal case addressing insurance coverage arising from a contractor's defective work, the plaintiff homeowners brought a claim against the defendant, Stone-E-Brick, a masonry contractor hired to pour concrete flooring on a veranda and to apply stucco to the exterior of their home. 81 N.J. at 235, 405 A.2d 788. Stone-E-Brick's CGL carrier refused coverage, asserting that two exclusions, the "insured products" exclusion, "(n)," and the "work performed" exclusion, "(o)," entitled the carrier to deny coverage. The policy provided as follows:
. . . [t]his insurance does not apply (n) to property damage to the named insured's products arising out of such products or any part of such products; (o) to property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith.
[Id. at 241, 405 A.2d 788.]
The Court in Weedo observed that there were two types of risks undertaken by contractors: business risks, and the risk of damage to people and other property due to the contractor's faulty workmanship. 81 N.J. at 239-40, 405 A.2d 788. Business risks arise from "not performing well" and require the contractor to absorb the costs for replacement or repair of his or her work to make the project conform to the agreed contractual requirements. Id. at 239, 405 A.2d 788. The contractor is not entitled to insurance coverage in such circumstances. Ibid. The Court reasoned that "[t]he insured-contractor can take pains to control the quality of the goods and services supplied . . . . [and] [t]he consequence of not performing well is part of every business venture." Ibid.
The second type of risk is tort liability for injury to people, and damage to property, which is the result of the faulty workmanship. Ibid. This risk is covered by insurance because it is an "accidental injury" that results from poor workmanship. Id. at 239-40, 405 A.2d 788. The Court held that defendant Stone-E-Brick was not entitled to coverage because the "insured's faulty work was not alleged to have caused any property damage to property other than the work product of[,] or materials supplied by[,] the insured." Id. at 242, 405 A.2d 788.
To underscore the difference between claims for the cost of repairing faulty workmanship, for which no coverage is due because it is a business risk, and the type of occurrences that do give rise to "insurable liability," the Weedo Court provided the following example:
. . . When a craftsman applies stucco to an exterior wall of a home in a faulty manner and discoloration, peeling and chipping result, the poorly-performed work will perforce have to be replaced or repaired by the tradesman or by a surety. On the other hand, should the stucco peel and fall from the wall, and thereby cause injury to the homeowner or his neighbor standing below or to a passing automobile, an occurrence of harm arises which is the proper subject of risk-sharing as provided by the type of policy before us in this case. The happenstance and extent of the latter liability is entirely unpredictable the neighbor could suffer a scratched arm or a fatal blow to the skull from the peeling stonework. Whether the liability of the businessman is predicated upon *725 warranty theory or, preferably and more accurately, upon tort concepts, injury to persons and damage to other property constitute the risks intended to be covered under the CGL.
[Id. at 240-42, 405 A.2d 788.]
Ultimately, the Court concluded that the (n) and (o) exclusions entitled the carrier to deny coverage because the claim being asserted by Stone-E-Brick was a "business risk" based on faulty workmanship for which insurance coverage under its policy would not apply. Id. at 241, 405 A.2d 788.
Here, the judge concluded that because Island Pool's claim for coverage was not based upon faulty workmanship, Island Pool should not be subject to the same exclusion from coverage that the defendant Stone-E-Brick suffered in Weedo, supra, 81 N.J. at 239-40, 405 A.2d 788. The judge's reasoning is, however, flawed. When it moved for summary judgment and when it opposed Island Pool's motion for summary judgment, Ohio Casualty emphasized that it was not relying upon the same exclusions that were at issue in Weedo but was instead relying on the "ongoing operations" exclusion contained in subsection j(5) of its policy. Because the judge improperly treated Ohio Casualty's denial of coverage as being based on a claim of faulty workmanship by Island Pool, the judge mistakenly proceeded to a conclusion that the circumstances of Island Pool were not attributable to faulty workmanship. Instead, according to the judge, Island Pool's loss was attributable to product failure, and therefore the "faulty workmanship" exclusion identified in Weedo would not apply, and Ohio Casualty was therefore obligated to provide coverage. The judge's reasoning might have been sound had Ohio Casualty been relying upon a "faulty workmanship" exclusion, but that is not the case.
Instead, the j(5) exclusion entitled Ohio Casualty to deny coverage for damages to the "particular part of real property" on which Island Pool was "performing operations, if the property damage arises out of those operations." Here, the damage to the homeowners' pool occurred while Island Pool was "performing operations," and it "ar[o]se[ ] out of those operations."[4] The record demonstrates that Island Pool had already emptied the homeowners' pool as part of the repainting work, but before the repainting could begin, heavy rains fell, which necessitated the installation of the pump to siphon off the accumulating underground water. Clearly, draining the pool was the first step in painting the pool, which was the work Island Pool was hired to perform. Thus, the property damage did "arise[ ] out of those operations," and occurred while Island Pool was "performing operations."
As Ohio Casualty correctly observes, no New Jersey court has had occasion to interpret the exclusion at issue here. However, an identical exclusion has been interpreted by other jurisdictions, Florida and Illinois, which have construed this exclusion on facts virtually identical to those presented here. In Van Ginhoven, supra, 788 So.2d at 389-90, an appellate court in Florida was presented with the question of whether the carrier, which had issued a CGL policy to a general contractor, Van Ginhoven, was obligated to provide coverage for the cost of repairing the damage to a swimming pool that had popped out of the ground after Van Ginhoven drained *726 the pool to make repairs to the surface. Subterranean water pressure was the cause of the pool doing so. Id. at 389. The carrier agreed to cover the damage to the adjacent decking, landscaping, and underground sprinkler system; however, it refused to provide coverage for the damage to the swimming pool itself, asserting that coverage for damage to the pool was barred by two specific policy exclusions. Id. at 390. The first of those exclusionswhich was identical to the j(5) exclusion at issue herespecified that the CGL policy did not apply to:
"Property Damage" to:
(5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations[.]
[Ibid.]
Van Ginhoven conceded that "when the pool popped, he was draining the pool, and thus working on, or performing operations on the pool." Id. at 391. The appellate panel therefore concluded that exclusion (5) was triggered, because that exclusion "bars coverage for property damage to `that particular part of real property on which [Van Ginhoven] . . . was [performing operations]'" Ibid. (brackets in the original). Agreeing with the carrier that the language of exclusion (5) was "clear, unambiguous and [did] not violate public policy," the panel concluded that exclusion (5) entitled the carrier to deny coverage for the cost of repairing the swimming pool because the damage to the pool occurred while Van Ginhoven was in the course of "performing operations" on the pool. Ibid. Thus, in Van Ginhoven, the Florida appellate panel concluded that the "ongoing operations" exclusion, identical to the j(5) exclusion here, entitled the CGL carrier to deny coverage for the cost of repairing the damage to the pool that was caused by the contractor while working on the pool. Ibid.
Similarly, in Pekin, supra, 235 Ill.Dec. 350, 704 N.E.2d at 924, an Illinois appellate panel considered an insurance coverage dispute arising from the carrier's refusal to pay for the cost of repairing the damage to a swimming pool after the pool popped out of the ground during the course of repainting work. The contractor, Willett, had drained the pool to paint it, and after completing the painting, but before he filled the pool with water as required by his contract with the homeowner, a heavy rainstorm caused the pool to push up out of the ground. Ibid. The homeowner filed suit, alleging Willett was negligent, either because he failed to understand and recognize the dangers associated with allowing the pool to remain empty for a significant period of time without taking appropriate precautionary measures or because he failed to fill the pool at the earliest opportunity, or both. Ibid. Willett admitted he had not completed the work at the time the swimming popped out of the ground. Id., 235 Ill.Dec. 350, 704 N.E.2d at 925.
The carrier refused coverage, relying on section j(5) of the CGL policy. Id., 235 Ill.Dec. 350, 704 N.E.2d at 926. In language identical to the j(5) exclusion at issue here, the policy stated that coverage was not provided for property damage to:
That particular part of real property on which [the insured] or any contractors or subcontractors working directly or indirectly on [the insured's] behalf if the "property damage" arises out of those operations.
[Ibid. (brackets in the original).]
The panel in Pekin held that the "clear and unambiguous" language of section j(5) excluded coverage to Willett for the property damage at issue, reasoning:

*727 . . . The underlying complaint alleged that a part of real property, namely, the swimming pool, was damaged while Willett was working on the swimming pool. It is undisputed that his work was not yet complete when the damage occurred. Further, the complaint alleged damage due to Willett's failure to fill the pool. Thus, the complaint alleged that the property damage . . . arose out of Willett's operations.
[Ibid.]
Thus, as in Van Ginhoven, the Pekin court held that where a contractor is hired to perform work on a swimming pool, and damages the pool while the work on the pool is ongoing, the j(5) ongoing operations exclusion bars coverage. Ibid.
Before deciding whether the reasoning of Van Ginhoven and Pekin is persuasive, we analyze the purposes a CGL policy is designed to achieve. Such policies, broadly speaking, "indemnify an insured against liability due to be paid to others for harm caused by the insured," and "are designed to meet the needs of virtually every small, medium and large organization . . . with regard to most kinds of `accidents' . . . that are likely to generate liability apart from those kinds of liability covered under more specialized policies." 20 Eric Mills Holmes, Holmes' Appleman on Insurance 2d § 129.1B (2002).[5] However, because of the CGL carrier's potential exposure to such a wide variety of risks, carriers have sought to narrow the scope of their liability by confining it to "well-defined accidents." Ibid. Consequently, other risks, such as breach of contract, and liability for business torts, are not covered by CGL insurance:
. . . [A] very broad and financially significant spectrum of liabilities involving legal injury to others, such as most liabilities for breach of contract, and liabilities for many different kinds of business torts and other commercial matters, are not intended to be covered, and are not in fact covered by general liability insurance. In this regard, it should be fairly obvious that insurance companies cannot, even for a high premium, assume all of the myriad potential liabilities of an organization which flow from the conduct of its affairs in ways that cause legal injury to contracting parties, customers, competitors, governmental entities and others, but which do not arise out of sudden, relatively unexpected and unpredictable events, such as "accidents." In general, legal injuries caused deliberately, or by what might be described as "errors or omissions" (E & O) of the insured as opposed to well-defined accidents, and legal injuries of a purely economic or commercial nature, are not the subject of general liability insurance, and in some cases they may not be the proper subject of insurance at all.

[Ibid. (emphasis added).]
Thus, "a CGL policy is not intended to insure business risks that are the normal, frequent, or predictable consequences of doing business and which businesses can control and manage." ACUITY, a Mut. Ins. Co. v. Burd & Smith Constr., Inc., 721 N.W.2d 33, 38 (N.D.2006).
As one commentator explained, many of the CGL exclusions are premised on the insurance industry's perception that certain types of losses are "so entirely within the insured's control as to violate the principle of fortuity." 1 Jeffrey E. Thomas, et al. eds., New Appleman Insurance Law *728 Practice Guide, ch. 5, § 3.11[1] (2011 ed.). Consequently, requiring coverage for a loss that is within the insured's control "would transform CGL policies into performance bonds." Ibid.
To accomplish the goal of avoiding unlimited liability, the insurance industry developed standardized policy forms in the latter part of the twentieth century, one of which is the exclusion at issue here, the "j(5)" "Ongoing Operations" exclusion. Holmes, supra, § 129.1c. "This exclusion applies to `ongoing operations,' meaning it excludes coverage for damage to property the insured is working on at the time the property damage occurs. . . ." 3 Jeffrey E. Thomas, New Appleman on Insurance Law, Library Edition § 18.03[10][h] (2010).
So long as the following three questions are answered in the affirmative, the j(5) exclusion will apply:
(1) Is the claim for damage to "real property"?
(2) Was the insured, or someone working on behalf of the insured, performing operations on "that particular part" of the property that was damaged; and
(3) Did the damage occur while the operations were being performed?
[Ibid.]
As the New Appleman treatise explains, the j(5) exclusion "is written in the present tenseit applies to property on which the insured `is performing' operations. The use of the present tense [signifies] . . . that the exclusion applies to damages that occur while the insured is working on the project." Ibid.
As these commentators have made clear, CGL policies are not designed to indemnify businesses such as Island Pool for property damage to the project that occurs while the contractor's work is ongoing, if such damage arises out of the contractor's "operations." The courts in Pekin and Van Ginhoven reached conclusions that are fully consistent with that well-understood and well-accepted premise. The reasoning of both courts is persuasive, and we have been presented with no meritorious basis upon which to reach a different result. We therefore hold that the j(5) exclusion entitled Ohio Casualty to deny coverage to Island Pool for the costs Island Pool incurred in repairing the damage to the homeowners' pool, because the damage occurred while Island Pool's repainting project was ongoing and the damage arose out of Island Pool's operations. The judge's ruling to the contrary was error, as was the resulting award of attorney's fees to Island Pool. We therefore reverse the two orders under review.
Reversed.
NOTES
[1] The litigation began when Ohio Casualty filed a collection action against Island Pool for unpaid premiums. Island Pool counterclaimed seeking coverage, and it is the counterclaim that is the subject of the present appeal. For that reason, the designation of plaintiff and defendant that would ordinarily apply in a coverage dispute is reversed in the present matter.
[2] The June 13, 2006 denial letter also relied on an additional policy exclusion, but because Ohio Casualty does not rely on that exclusion in its appeal, we need not discuss it.
[3] The judge's reference to Cypreco was the unreported Law Division opinion in Cypreco Industries v. Great American E & S Insurance Co., No. MON-L-146-08 (Law Div. December 1, 2008).
[4] As we have already noted, Ohio Casualty concedes that it was required to cover damage to the homeowners' deck and landscaping because Island Pool was not working on them.
[5] Such specialized policies include automobile, navigation and aircraft risks; professional liability; directors and officers coverage; workers' compensation liability; and liquor liability. Id. at § 129.1A.