NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4969-18

JILL CADRE and THE
CADRE LAW FIRM, LLC,

       Plaintiffs-Appellants,

v.

PROASSURANCE CASUALTY
COMPANY,

       Defendant-Respondent,

and

ALL POINT INSURANCE
AGENCY,

       Defendant.

_____

> **APPROVED FOR PUBLICATION**
>
> **June 9, 2021**
>
> **APPELLATE DIVISION**

Argued November 2, 2020 – Decided June 9, 2021

Before Judges Messano, Hoffman and Suter.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, L-10530-15.

Francis X. Garrity argued the cause for appellants (Garrity, Graham, Murphy, Garofalo & Flinn, PC, attorneys; Jane Garrity Glass, of counsel; Francis X. Garrity, on the briefs).

Suzanne C. Midlige argued the cause for respondent (Coughlin, Midlige & Garland, LLP, attorneys; Suzanne C. Midlige, of counsel and on the brief; Michael E. Hrinewski, on the brief).

The opinion of the court was delivered by

MESSANO, P.J.A.D.

Plaintiff Jill Cadre is a New Jersey attorney who conducts her practice as a limited liability company — The Cadre Law Firm, LLC. Rule 1:21-1B (the Rule) governs the practice of law as an LLC and, among other things, mandates that attorneys who do so must procure professional liability insurance that provides coverage to the LLC for damages "arising out of the performance of professional services by attorneys employed by the [LLC] in their capacities as attorneys." R. 1:21-1B(a)(4).

Plaintiff purchased a LawyerCare professional liability insurance policy (the Policy) from defendant ProAssurance Casualty Company.[1] In 2015, in preparation for a compliance audit by the Office of Attorney Ethics (OAE), plaintiff discovered that one of her employees, Miguel Mayorga, a paralegal, misappropriated approximately $800,000 of clients' funds held in the LLC's

---

[1] We use the singular "plaintiff" for ease of reference to both the LLC and Cadre, except where necessary to distinguish the two.

trust account in connection with real estate closings.[2]  Plaintiff notified defendant of a potential claim under the Policy.[3]  Defendant declined coverage, relying on the Policy's definition of covered "damages," which specifically did not include "misappropriated client funds."

Plaintiff filed a declaratory judgment action in the Law Division; defendant successfully removed the complaint to federal district court on diversity grounds and filed its answer.  Plaintiff moved for summary judgment, which the judge denied.  In his written opinion, applying standards governing summary judgment motions in the district court, the judge was unable to "find that the proffered evidence poses no genuine issue and requires judgment in favor of [plaintiff]."  He denied the motion "at this time."  In doing so, the judge rejected some of the same arguments plaintiff now reprises before us.

Plaintiff successfully amended her complaint with defendant's consent and added the insurance broker who procured the Policy, All Point Insurance Agency (All Point), as a defendant.  This defeated the district court's diversity

---

[2]  Although an arrest warrant issued, Mayorga fled the country.

[3]  On November 25, 2019, the Disciplinary Review Board admonished plaintiff for violating "RPC 1.15(a) (negligent misappropriation of client funds, more appropriately, failure to safeguard client funds), RPC 1.15(d) (failure to comply with . . . recordkeeping provisions . . .), and RPC 5.3(a) and (b) (failure to make reasonable efforts to ensure . . . the conduct of nonlawyers is compatible with the lawyer's professional obligations)."

jurisdiction, and the matter was remanded to the Law Division. Plaintiff filed an amended complaint adding All Point and alleging it was negligent and breached its fiduciary and contractual obligations by not procuring a policy that complied with the Rule.

Plaintiff moved for summary judgment seeking to reform the Policy to provide coverage for claims resulting from the misappropriated client funds. Defendant cross-moved for summary judgment dismissing the complaint, and the Law Division judge heard oral argument.[4] In two orders, she denied plaintiff's motion, granted defendant's motion, and dismissed plaintiff's complaint. This appeal followed.

I.

Before turning to plaintiff's arguments, we summarize some additional evidence in the motion record. See Ji v. Palmer, 333 N.J. Super. 451, 463–64 (App. Div. 2000) (noting in reviewing the grant of summary judgment, an appellate court limits it review to the motion record (citing Bilotti v. Accurate Forming Corp., 39 N.J. 184, 188 (1963))).

---

[4] After oral argument but prior to the judge's written decision and entry of the orders under review, plaintiff and All Point settled their dispute and filed a consent stipulation of dismissal with prejudice. All Point has not participated in this appeal.

A-4969-18

Plaintiff had been practicing law as an LLC since 2009 and purchased or renewed a professional liability policy from defendant every year since 2010. In May 2015, OAE requested that plaintiff furnish the certificate of insurance required by the Rule. See R. 1:21-1B(b). Plaintiff, who was unaware of the Rule's requirements at that time, obtained the certificate through All Point and filed it with the Clerk of the Supreme Court.

The Policy's limits were $1 million per claim and $1 million in the aggregate.[5] Among other things, the Policy insured plaintiff for "all sums . . . which [plaintiff became] legally obligated to pay as damages because of any claim . . . involving any act, error or omission in rendering or failing to render professional services by [plaintiff] or by any person for whose acts, errors, or omissions [plaintiff] is legally responsible . . . ." The Policy included the following definitions:

> Damages means monetary judgments, awards or settlements, but does not include the return or restitution of legal fees, costs and expenses charged by the Insured, or any allegedly misappropriated client funds or interest thereon.
>
> . . . .

---

[5] The LLC was the named insured on the Policy, and Cadre was also named as an insured, but only as to claims involving the rendering of professional services.

A-4969-18

Insured means (1) the Named Insured . . . or (5) any non-lawyer who was or is an employee of the Named Insured . . . solely while acting within the scope of their employment on behalf of the Named Insured . . . ;

. . . .

Professional Services means services rendered by an Insured as a provider of legal services in a lawyer- client relationship. <u>Professional services shall also include activities of an Insured as a … trustee, or in any similar fiduciary capacity</u> . . . .

[(Emphases added).]

The Policy had several exclusions, but also included the following provision entitled, "Innocent Insureds":

If a claim is made involving the dishonest, criminal, malicious or fraudulent act, error, or omission of an Insured, this policy will apply to any Insured who did not participate in, acquiesce in or fail to take appropriate action after having knowledge of such acts, errors or omissions, provided that such Insured complied with all policy provisions.

Lastly, the Policy provided: "The terms of this policy which are in conflict with the statutes of the state wherein this policy is issued are hereby amended to conform to such statutes."

Upon discovering Mayorga's defalcation, plaintiff restored the funds to her trust account and directed All Point to place defendant on notice of the loss. Defendant's declination letter stated:

6

[I]t appears the only funds you seek are those funds which have been misappropriated from your law firm's trust account through the conduct of your former employee . . . . The return or restitution of such misappropriated funds is not included within the definition of damages covered by the Policy.

Based upon the foregoing, there is no coverage available for the present . . . [c]laim for reimbursement to your trust account of the misappropriated funds.

According to Karen Blohm, defendant's Marketing Director, the company began issuing professional liability policies to attorneys in New Jersey in 2008, and the specific form policy at issue — LCP 100 (2/12) — "ha[d] been in use since 2012 and contain[ed] the same definition of damages." Since then, defendant issued the Policy to more than 2000 New Jersey attorneys.

Defendant submitted hundreds of pages of documents to the New Jersey Department of Banking and Insurance (DOBI) seeking approval of the Policy before ever issuing it. As part of its review, DOBI submitted questions, comments, and suggested revisions to defendant regarding the proposed Policy, including the Policy's definitions and exclusions. DOBI did not object to or request any revision to the Policy's definition of "damages" or the scope of coverage, and it ultimately approved the Policy as issued to plaintiff. Defendant's general counsel testified at his deposition that before issuing

7

professional liability policies for attorneys in New Jersey, the legal department "did not investigate or assess or research . . . any statutes or anything else that govern[s] and regulate[s] the conduct of attorneys in . . . New Jersey."

## II.

Plaintiff urges us to reverse the Law Division's orders and remand the matter for entry of judgment declaring that the Policy provides coverage "for breach of a fiduciary obligation that results in misappropriation of client funds." We consider each of plaintiff's arguments, conclude none of them compel reversal and affirm.

## A.

When reviewing the grant of summary judgment, we apply the "same standard as the motion judge." Globe Motor Co. v. Igdalev, 225 N.J. 469, 479 (2016) (quoting Bhagat v. Bhagat, 217 N.J. 22, 38 (2014)).

> That standard mandates that summary judgment be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."
> [Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016) (quoting R. 4:46-2(c)).]

Like "the trial court[, we] must 'consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-

moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)).

We owe no deference to the motion judge's legal analysis or interpretation of a statute. The Palisades At Fort Lee Condo. Ass'n v. 100 Old Palisade, LLC, 230 N.J. 427, 442 (2017) (citing Zabilowicz v. Kelsey, 200 N.J. 507, 512 (2009)). Similarly, "we review legal determinations based on an interpretation of our court rules de novo." Occhifinto v. Olivo Constr. Co., LLC, 221 N.J. 443, 453 (2015) (citing State ex rel. A.B., 219 N.J. 542, 554–55 (2014)).

So, too, interpretation of an insurance policy is a question of law subject to our de novo review. Estate of Pickett v. Moore's Lounge, 464 N.J. Super. 549, 554–55 (App. Div. 2020) (citing Abboud v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 450 N.J. Super. 400, 406 (App. Div. 2017)). The guideposts for our review in this regard are well known.

"Insurance policies are construed in accordance with principles that govern the interpretation of contracts; the parties' agreement 'will be enforced as written when its terms are clear in order that the expectations of the parties will be fulfilled.'" Mem'l Props., LLC v. Zurich Am. Ins. Co., 210 N.J. 512,

9

525 (2012) (quoting Flomerfelt v. Cardiello, 202 N.J. 432, 441 (2010)). "If the terms are not clear, but instead are ambiguous, they are construed against the insurer and in favor of the insured, in order to give effect to the insured's reasonable expectations." Flomerfelt, 202 N.J. at 441 (citing Doto v. Russo, 140 N.J. 544, 556 (1995); Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175 (1992)).

> A provision is ambiguous if it is "subject to more than one reasonable interpretation," and "[o]nly where there is genuine ambiguity, that is, where the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage, should the reviewing court read the policy in favor of the insured."
>
> [Estate of Pickett, 464 N.J. Super. at 555 (alteration in original) (quoting Templo Fuente De Vida, 224 N.J. at 200).]

### B.

We clear the field before turning our attention to plaintiff's major arguments.

In her written decision, the motion judge specifically cited the federal district court judge's prior decision denying plaintiff's summary judgment motion as "law of the case," noting "arguably [his decision] would be sufficient to dispose of the case." The motion judge nonetheless considered

plaintiff's arguments on the merits "[i]n the interest of thoroughness and completeness."

Plaintiff's first point on appeal contends it was error for the judge to apply the law of the case doctrine at all. We agree. The district court judge was applying the same standard to decide plaintiff's summary judgment motion that we would apply. See, e.g., Mourning v. Corr. Med. Servs. of St. Louis, Mo., 300 N.J. Super. 213, 223 (App. Div. 1997) ("The Brill Court adopted the federal summary judgment standard."). The district court's denial of plaintiff's summary judgment motion only determined that plaintiff had failed to carry the burden of proof under summary judgment standards.

More importantly, "[a] prior denial of summary judgment should not be viewed as law of the case since '[s]uch a denial merely postpones decision of any question; it decides none.'" Speeney v. Rutgers, 673 F. App'x 149, 152 n.2 (3d Cir. 2016) (alteration in original) (quoting Dessar v. Bank of Am. Nat'l Tr. & Sav. Ass'n, 353 F.2d 468, 470 (9th Cir. 1965)). The same principle applies in our courts. See Gonzalez v. Ideal Tile Importing Co., 371 N.J. Super. 349, 356 (App. Div. 2004) (holding that "an order denying summary judgment is not subject to the law of the case doctrine because it decides nothing and merely reserves issues for future disposition"), aff'd on other grounds, 184 N.J. 415 (2005); Blunt v. Klapproth, 309 N.J. Super. 493, 504 (App. Div. 1998)

11

("Denial of summary judgment preserves rather than resolves issues; therefore, later reconsideration of matters implicated in the motion, including the reasons in support of the denial, are not precluded." (citing A & P Sheet Metal Co. v. Edward Hansen, Inc., 140 N.J. Super. 566, 573–74 (Law Div. 1976))).

Additionally, as defendant points out, the second count of plaintiff's complaint sought damages and a jury trial alleging defendant's "bad faith" in denying coverage. On appeal, plaintiff makes no argument challenging the grant of summary judgment as to this count in the complaint. "[W]e deem plaintiff to have abandoned any appeal of the order dismissing" count two of the complaint alleging defendant's bad faith. Pullen v. Galloway, 461 N.J. Super. 587, 595 (App. Div. 2019) (citing N.J. Dep't of Env't Prot. v. Alloway Twp., 438 N.J. Super. 501, 505 n.2 (App. Div. 2015)).

III.

Plaintiff's principal argument is that defendant was obligated to issue a professional liability policy that complied with the Rule's "minimum coverage requirements." Plaintiff contends the Rule carries the force of statutory law, and only the Supreme Court, not DOBI, can regulate professional liability policies for practicing lawyers in New Jersey. Plaintiff analogizes to other cases in which the Court reformed insurance policies to meet minimum statutory requirements and argues that reformation is appropriate here because

12

the Rule, which is intended to protect the public, prohibits the issuance of a policy that categorically denies any coverage for damages resulting from misappropriation of clients' funds.

The Rule requires an LLC practicing law to comply with all provisions of the "'New Jersey Limited Liability Company Act,' N.J.S.A. 42:2B-1 through 70, . . . except where inconsistent" with the Rule.[6]   R. 1:21-1B(a)(1). Additionally, "[a]ny violation of [the Rule] by the [LLC] shall be grounds for the Supreme Court to terminate or suspend the [LLC's] right to practice law or otherwise to discipline it."  R. 1:21-1B(a)(3).

Rule 1:21-1B(a)(4) requires the LLC obtain:

> one or more policies of lawyers' professional liability insurance which shall insure the [LLC] against liability imposed upon it by law for damages resulting from any claim made against the [LLC] by its clients arising out of the performance of professional services by attorneys employed by the [LLC] in their capacities as attorneys.
>
> [(Emphasis added).]

Rule 1:21-1B(b) further provides:

> Within [thirty] days after filing its certificate of formation . . . each [LLC] engaged in the practice of law shall file with the Clerk of the Supreme Court a

---

[6]  The statute has been repealed and replaced with the Revised Uniform Limited Liability Company Act, N.J.S.A. 42:2C-1 to -94.  The Rule has not been revised to reflect this change.

certificate of insurance, issued by the insurer, setting forth the name and address of the insurance company writing the insurance policies required by paragraph (a)(4) of this rule and the policy number and policy limits.

The Rule specifically states that any "member, employee, agent, or representative of the [LLC] shall remain personally liable for his or her own negligence, omissions, malpractice, wrongful acts, or misconduct, and that of any person under his or her direct supervision and control while rendering professional services on behalf of the [LLC]." R. 1:21-1B(a)(2); see also R. 1:21-1(C)(a)(3) (requiring maintenance of similar professional liability insurance by limited liability partnerships (LLP) practicing law); and (C)(a)(1) (similarly preserving personal liability for a "member, employee, agent, or representative" of the LLP).

Defendant does not squarely assert that the Policy provided the coverage required by the Rule, and to be clear, it does not. Although the Rule does not specifically require an LLC to obtain insurance covering claims arising from the misappropriation of funds the LLC holds as a fiduciary, the insurance policy referenced in subsection (a)(4) must do so to comply with the Rule. That is so because an attorney inherently owes an enhanced fiduciary duty to his or her client. See Delaney v. Dickey, 244 N.J. 466, 485 (2020) (explaining the "even higher degree of responsibility" in the fiduciary relationship between

14

attorney and client (citing <u>In re Honig</u>, 10 N.J. 74, 78 (1952))).  In addition, the "client's claim concerning the defendant-attorney's breach of a fiduciary duty may arise in the legal malpractice context."  <u>Packard-Bamberger & Co. v. Collier</u>, 167 N.J. 427, 443 (2001).  <u>See also</u> <u>In re Pomerantz</u>, 155 N.J. 122, 136 (1998) (holding that "[l]awyers may not absolve themselves of the <u>misappropriation of client funds</u> by delegating to employees the authority to complete signed checks and then failing to supervise these employees" (emphasis added) (citing <u>In re Irizarry</u>, 141 N.J. 189, 193 (1995))).

That the misappropriation of client funds entrusted to an LLC is conduct which the <u>Rule</u> intends the LLC insure against is implicit from the Court's holding in <u>First Am. Title Ins. Co. v. Lawson</u>, 177 N.J. 125 (2003).  There, two partners in a three-partner law firm practicing as an LLP engaged in a "kiting" scheme whereby monies from one client's trust account were transferred to pay the obligations of another client or the expenses of the firm.  <u>Id.</u> at 130.  Because of misrepresentations made by the managing partner when applying for malpractice insurance, the insurer denied claims made by the plaintiffs, two title insurance companies that paid third-party claims based upon the partners' defalcations.  <u>Id.</u> at 132–33.

As a result, the third partner, who had not participated in the scheme, was left without coverage under the malpractice policy.  <u>Id.</u> at 134.  The issue

was whether the otherwise justified recission of the policy based upon material misrepresentations by the LLP's managing partner should void potential coverage to the innocent third partner. The Court held that voiding the policy as to the innocent partner "could leave members of the public . . . unprotected even though the insured himself committed no fraud. . . . [T]hat harsh and sweeping result would be contrary to the public interest." Id. at 143.

The Court set forth the balance of interests struck by Rule 1:21-1C, which specifically deals with the practice of law by an LLP.

> On the one hand, Rule 1:21-1C provides attorneys the opportunity to practice in a chosen entity that includes limited liability for its members. On the other, it seeks to protect consumers of legal services from attorney malpractice by requiring such entities to maintain adequate insurance. . . . At bottom, the rule helps to limit the public's exposure to uninsured risks arising from the receipt of legal services in this State.
>
> [Id. at 139.]

The Lawson Court's statement regarding Rule 1:21-1C applies with equal force to the Rule here. Both rules were adopted at the same time following the report of the Court's Ad Hoc Committee. See Rep. of the Comm. on the Prac. of Law by Ltd. Liab. Cos. and Ltd. Liab. P'ships, reprinted in 145 N.J.L.J. 308 (1996). Both rules are materially similar in requiring the organization's maintenance of professional liability policies, and both maintain personal liability of individual members or partners for their own acts or omissions. It

16

follows, as plaintiff argues, that the purpose of the Rule mandating an LLC maintain professional liability insurance is to protect the public from certain uninsured risks.

We apply the same canons of construction to a court rule that we apply to a statute. Mortg. Grader, Inc. v. Ward & Olivo, LLP, 438 N.J. Super. 202, 210 (App. Div. 2014) (quoting Wiese v. Dedhia, 188 N.J. 587, 592 (2006), aff'd 225 N.J. 423 (2016)). Here, the Rule is unambiguous, and we "ascribe to the [words of the rule] their ordinary meaning and significance." Wiese, 188 N.J. at 592 (alteration in original) (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)). An LLC practicing law in New Jersey must be insured "against liability imposed upon it by law for damages resulting from any claim made . . . by its clients arising out of the performance of professional services by attorneys employed by the [LLC] in their capacities as attorneys." R. 1:21-1B(a)(4). The fiduciary obligation of an LLC to secure clients' funds held in trust is part and parcel of the professional services the LLC renders to its clients.[7] Per force, a professional liability policy that defines "damages" to exclude all possibility of coverage against claims seeking restitution of

---

[7]    Indeed, the Policy itself recognized this truism because it defined "[p]rofessional services" to include "activities of an [i]nsured as a … trustee, or in any similar fiduciary capacity."

A-4969-18

misappropriated funds does not provide coverage to the extent required by the Rule.

Yet, we wish to be clear lest our holding be misconstrued and extended beyond its intent. The Rule specifically permits more than one policy to provide the required coverage to the LLC, so standing alone the inadequacy of the Policy in this case does not necessarily mean the LLC was non-compliant.[8] More importantly, the Rule only requires a policy that provides coverage to the LLC "against liability imposed upon it by law," and we hazard no opinion regarding the scope of coverage provided by a particular policy and whether it therefore meets the requirement of the Rule. See Lawson, 177 N.J. at 143 (although rescission as to the innocent partner was inappropriate, the Court did not "suggest an opinion in respect of the scope of that coverage or any other issue as it might relate to the policy's existence insofar as [the innocent partner] is concerned"). As the motion judge noted, and as plaintiff's counsel essentially conceded during oral argument before her, a compliant policy may include exclusions or other limitations of coverage, e.g., an exclusion for intentional acts of the insured. We only conclude that this Policy, which

---

[8] Plaintiff in fact purchased a separate policy through All Point that provided very limited coverage for instances of "employee theft." The motion judge referenced this in her opinion, and plaintiff acknowledges that in her brief. The record does not include that policy or the particulars of plaintiff's claim.

A-4969-18

provided no coverage whatsoever for damage claims arising from the misappropriation of clients' trust funds, did not provide coverage to meet the requirements of the Rule.

Defendant argues the Rule only governs the conduct of attorneys practicing as LLCs in New Jersey, not insurers, and the Rule does not mandate "the scope of coverage" provided by insurers authorized to issue professional liability policies in the State. Plaintiff's retort is threefold: 1) only the Court can regulate the conduct of attorneys who practice in New Jersey; 2) the Rule has the force of law equivalent to a statute; and 3) therefore, every professional liability insurance policy provided to LLCs that practice law in New Jersey must be reformed as necessary to provide the coverage required by the Rule.

"The constitutional spirit inherent in the separation of governmental powers contemplates that each branch of government will exercise fully its own powers without transgressing upon powers rightfully belonging to a cognate branch." Commc'ns Workers of Am. v. N.J. Civ. Serv. Comm'n, 234 N.J. 483, 541 (2018) (quoting Knight v. Margate, 86 N.J. 374, 388 (1981)). The 1947 Constitution ceded to the Court the authority to "make rules governing the administration of all courts in the State and, subject to the law, the practice and procedure in all such courts[,]" as well as exclusive "jurisdiction over the admission to the practice of law and the discipline of

19

persons admitted." N.J. Const. art. VI, § 2, ¶ 3 (emphasis added). "Th[e] Court's power to regulate attorneys is exclusive." McKeown-Brand v. Trump Castle Hotel & Casino, 132 N.J. 546, 556 (1993) (citing In re LiVolsi, 85 N.J. 576, 583 (1981); State v. Rush, 46 N.J. 399, 411–12 (1966)).

However, plaintiff misapprehends the scope of the Court's power. As Chief Justice Vanderbilt said long ago:

> The phrase "subject to law" in Article VI, Section II, paragraph 3 of the Constitution thus serves as a continuous reminder that the rule-making power as to practice and procedure must not invade the field of the substantive law as such. While the courts necessarily make new substantive law through the decision of specific cases coming before them, they are not to make substantive law wholesale through the exercise of the rule-making power.
>
> [Winberry v. Salisbury, 5 N.J. 240, 248 (1950); accord In re P.L. 2001, Chapter 362., 186 N.J. 368, 380 (2006) (citing Winberry, 5 N.J. at 247–48).]

Moreover, "[n]otwithstanding that grant of [constitutional] authority, '[i]n the spirit of comity,' th[e] Court has shared its jurisdiction with the Legislature and 'upheld narrowly-circumscribed legislation that touches on attorney discipline.'" In re Advisory Comm. on Pro. Ethics Op. 705, 192 N.J. 46, 55 (2007) (third alteration in original) (quoting McKeown-Brand, 132 N.J. at 554, 556).

The Court's opinion in In re Op. 705 demonstrates the flexibility of these concepts. There, the Legislature enacted N.J.S.A. 52:13D-17, which "impute[d] the conflict of interest of a former State government employee — including an attorney — to the entire partnership, firm, or corporation in which the former employee obtains an 'interest,' as statutorily defined." 192 N.J. at 52. The law directly conflicted with RPC 1.11, which permitted the firm to undertake certain procedures to "cure" any conflict. Id. at 53. The Court applied a two-prong analysis — "the legitimacy of the governmental purpose of [the statute] and the nature and extent of its encroachment upon judicial prerogatives and interests." Id. at 56 (quoting Knight, 86 N.J. at 391). The Court concluded:

> because N.J.S.A. 52:13D-17 serves a legitimate governmental purpose and because its encroachment on judicial prerogatives is not improper, we defer to the Legislature and hold that attorneys formerly employed by the State must comply with the post-employment strictures of both N.J.S.A. 52:13D-17 and RPC 1.11.
>
> [Id. at 58.]

Here, the insurance requirements of the Rule did not conflict with any statute, nor did it compel plaintiff to purchase a particular professional liability policy. Plaintiff's reliance on the Court's most recent decision in Huggins v. Aquilar, ___ N.J. ___, ___ (2021), Motor Club of Am. Ins. Co. v. Phillips, 66

N.J. 277, 286 (1974), or our decision in Hoglin v. Nationwide Mut. Ins. Co., 144 N.J. Super 475, 482 (App. Div. 1976), is misplaced. Those cases resulted in the reformation of insurance policies that, although they may have been administratively approved, "evade[d] minimum insurance requirements set by law." Huggins, ___ N.J. at ___ (slip op. at 21) (emphasis added).

Simply put, the Rule regulates the conduct of attorneys, not insurers. Plaintiff cites no authority for the proposition that the Court, acting within its constitutional spheres of attorney discipline and administration of the courts, has the power to enact a rule that regulates the conduct of insurers doing business in the state, a function the Legislature delegated to DOBI. N.J.S.A. 17:1-15.

Our conclusion is bolstered by our decision in Mortgage Grader and the Court's subsequent affirmance, two decisions that both parties failed to reference in their briefs. There, we granted the defendant-lawyer, a partner in an LLP, leave to appeal an order denying his motion to dismiss the malpractice complaint filed by the plaintiff, one of the firm's clients, alleging the defendant was vicariously liable for his partner's negligence. 438 N.J. Super. at 205–07. Although the trial judge concluded the plaintiff failed to comply with the Affidavit of Merit Statute, he denied the defendant's motion. Id. at 208.

A-4969-18

The trial judge reasoned that the LLP violated Rule 1:21-1C(a)(3), which, like the Rule in this case, mandates that an LLP practicing law maintain professional liability insurance, because the partnership's liability policy lapsed, and the LLP was now uninsured. Ibid. The judge concluded that as a result, the LLP was "relegated . . . to the status of a [GP] [(general partnership)]," and the defendant lost any protection accorded a limited partner. Ibid. (first alteration in original); see N.J.S.A. 42:1A-18(c) ("An obligation of a partnership incurred while the partnership is [an LLP] . . . is solely the obligation of the partnership. A partner is not personally liable . . . .").

We concluded that nowhere in the partnership statute "did the Legislature state that, when attorneys practice as an LLP, the LLP reverts to a GP if it fails to maintain professional liability insurance, as required by the court rules." Id. at 210. We noted the rule was "unambiguous," and the Court "enumerated specific sanctions against LLPs for failing to comply with Rule 1:21-1C[,]" including the termination or suspension of the LLP's right to practice law or to otherwise discipline the LLP. Id. at 211–12 (citing R. 1:21-1C(a)(2)).

> [I]f attorneys practice as an LLP, and the LLP fails to maintain malpractice insurance as required by the court rules, then the Supreme Court may terminate or suspend the LLP's right to practice law or otherwise

23

discipline it. As currently written, however, the court rules do not authorize a trial court to sanction a partner of an LLP for practicing law as an LLP without the required professional liability insurance by converting an otherwise properly organized LLP into a GP.

[Ibid.]

The Court granted the plaintiff's motion for leave to appeal. 225 N.J. at 432 (citing 221 N.J. 216 (2015)). Initially, the Court concluded that an LLP practicing law need not maintain professional liability insurance during its wind down period, and therefore, because the LLP maintained insurance at the time of the alleged malpractice, it had not violated Rule 1:21-1C(a)(3). Id. at 438–39.

More importantly for our purposes, the Court stated, "only this Court has the authority to discipline a law firm organized as an LLP. Here, the trial court erred by relying on a disciplinary rule that only this Court may use." Id. at 439 (emphasis added). The Court noted appropriate discipline "is circumscribed by a variety of sanctions imposed through the court rules[,]" and "[b]ecause only this Court may use Rule 1:21-1C to discipline a law firm organized as an LLP, and the Court Rules do not list conversion of business organizational form as a type of sanction, . . . conversion . . . from an LLP to a GP was improper under the Rule." Id. at 439–40.

A-4969-18

We acknowledge the factual distinctions between this case and Mortgage Grader, most notably the absence of any policy at all in that case and the trial court's overreach in fashioning a remedy that "reformed" a statute, not an insurance policy. Nonetheless, we think the Court's dicta in Mortgage Grader is persuasive and should "carry great weight." Marconi v. United Airlines, 460 N.J. Super. 330, 339 (App. Div. 2019) (quoting In re A.D., 441 N.J. Super. 403, 422–23 (App. Div. 2015)).

The Rule is a "disciplinary rule" firmly rooted in the Court's exclusive constitutional powers. The Court in Mortgage Grader did not, for example, use that power to revive the malpractice insurance policy that had lapsed to provide coverage to the LLP and the innocent defendant-partner during the wind down period and offer the plaintiff a source of recovery if successful in its malpractice claim.

Plaintiff's contention that the Policy must be reformed because it failed to comply with the requirements of the Rule is unavailing.[9]

---

[9]  In a separate point, plaintiff argues defendant is bound by the "representations made to the Clerk of the Supreme Court . . . in the certificate of insurance." The contention requires no discussion in a written opinion. R. 2:11-3(e)(1)(E). The Rule requires the LLC to file the certificate of insurance, and it is the LLC's representation and its representation alone that the proffered certificate is proof of compliance with the Rule. R. 1:21-1B(b). Moreover, the Rule permits the LLC to obtain "one or more policies" to comply with the

IV.

Plaintiff contends that the Policy's definition of "damages" was ambiguous and inconspicuous, and that the Policy failed to meet the "reasonable expectations" of its insureds. As a corollary to the reasonable expectations claim, plaintiff contends that defendant negligently misrepresented that the Policy complied with the Rule.

The motion judge rejected these arguments by noting the limitation on covered damages was not ambiguous, and plaintiff knew or should have known the Policy provided no insurance for claims involving damages resulting from misappropriated client funds. The judge also found plaintiff's purchase of a second policy covering "employee theft" to be persuasive in demonstrating plaintiff was aware the Policy provided no coverage for misappropriated funds. Lastly, the judge noted that plaintiff could not have relied upon any misrepresentation by defendant about the Policy's coverage and whether it complied with the Rule because plaintiff was unaware of the Rule until the OAE requested the certificate of insurance.

We begin by recognizing that "[t]he language in the policy underscores the basic notion that the premium paid by the insured does not buy coverage

---

Rule; it logically follows that only the LLC, not the insurer, can furnish the necessary certification of compliance with the Rule.

 A-4969-18

for all . . . damage but only for that type of damage provided for in the policy." Ohio Cas. Ins. Co. v. Island Pool & Spa, Inc., 418 N.J. Super. 162, 169 (App. Div. 2011) (quoting Hardy v. Abdul-Matin, 198 N.J. 95, 102 (2009)). "It is fundamental that in the absence of a statutory prohibition to the contrary, an insurance company has a right to impose whatever conditions it desires prior to assuming its obligations[.]" Royal Ins. Co. v. Rutgers Cas. Ins. Co., 271 N.J. Super. 409, 419 (App. Div. 1994). "If the plain language of the policy is unambiguous, we will 'not "engage in a strained construction to support the imposition of liability" or write a better policy for the insured than the one purchased.'" Templo Fuente De Vida, 224 N.J. at 200 (quoting Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am., 195 N.J. 231, 238 (2008)).

We acknowledge plaintiff's point that her claim could be framed as one seeking coverage for the negligent breach of fiduciary obligations, not employee theft. In that regard, the purchase of a second policy specifically covering claims for employee theft lacks little relevance. However, there is nothing ambiguous about the limitation on coverage provided by the Policy. Defendant limited the insuring agreement by clearly excluding any obligation to pay a certain type of damage claim, i.e., damages seeking the "return or restitution" of "any allegedly misappropriated client funds." Plaintiff has

never asserted the damages for which she sought coverage did not result from "misappropriated client funds."

Plaintiff also argues that the Policy is ambiguous because although it contained a specific exclusion for "any claim involving willful wrongdoing or any dishonest, criminal, malicious or fraudulent act, error or omission," the "innocent insured" provision was an exception to the exclusion. Plaintiff asserts the "innocent insured" provision applied because she was unaware of Mayorga's crimes until she prepared for the OAE audit. However, any exclusion and any exception to an exclusion are only implicated if there is coverage in the first place. Here, there was no coverage for any claim seeking the return or restitution of misappropriated client funds.

Similarly, plaintiff notes the Policy's definition of "professional services" included coverage for an alleged breach of a fiduciary duty. However, that definition does not expand the universe of "damages" for which the Policy provided insurance. It is conceivable, certainly, that the LLC could act as a trustee or fiduciary for monies or other tangible items that were not "client funds." See, e.g., Innes v. Marzano-Lesnevich, 435 N.J. Super. 198, 217 (App. Div. 2014) (recognizing viable cause of action against an attorney for failing to hold in trust child's passport in contested custody case), aff'd and mod. on other grounds, 224 N.J. 584, 599 (2016). However, in this case, it is

apparently undisputed that the only damages for which plaintiff sought defense and indemnification were the monies attributable to Mayorga's defalcation of clients' funds.

"Our courts 'have recognized the importance of construing contracts of insurance to reflect the reasonable expectations of the insured in the face of ambiguous language and phrasing, and in exceptional circumstances, when the literal meaning of the policy is plain.'" Abboud, 450 N.J. Super. at 408 (emphases added) (quoting Doto, 140 N.J. at 556). "Courts are more inclined to apply the doctrine in cases of personal lines of insurance obtained by an unsophisticated consumer." Id. at 409.

"Courts may vindicate the insured's reasonable expectations over the policy's literal meaning 'if the text appears overly technical or contains hidden pitfalls, cannot be understood without employing subtle or legalistic distinctions, is obscured by fine print, or requires strenuous study to comprehend.'" Ibid. (quoting Zacarias v. Allstate Ins. Co., 168 N.J. 590, 601 (2001)). "The expectations of coverage must be real[,] . . . [and] also be 'objectively reasonable.'" Id. at 410.

As noted, there was nothing ambiguous about the insuring agreement of the Policy; it used plain language and the definition of covered damages was conspicuously included within the definition section. Plaintiff was not "an

unsophisticated consumer."  In her renewal application for the relevant year, plaintiff said she handled one-hundred thirty real estate closings per year, with the average real estate value of $350,000, and the highest value of $1.3 million.

Plaintiff contends that defendant was actively marketing its LawyerCare policy, yet it never researched the Rule's requirements and never represented that the Policy complied with the Rule.  Plaintiff asserts defendant was in "the best position to discover the insurance requirements" of the Rule.  The argument is unsettling.  Who is charged with a greater knowledge of our Rules of Court, particularly those governing the practice of law contained in Rule 1:21-1 to -12, than a licensed attorney?  See Michels, N.J. Attorney Ethics § 1:2-2 (2021) (discussing relationship between the Rules of Court and attorney discipline).  Yet, plaintiff acknowledged that until OAE requested a certificate of insurance, she was ignorant of the Rule's requirements.

Plaintiff relies on Sears Mortg. Corp. v. Rose, 134 N.J. 326 (1993), in asserting that defendant had an affirmative obligation to advise her that the Policy did not meet the requirements of the Rule.  In Sears, the purchaser's attorney collected funds at closing, paid the premium to the title insurance company, which had pre-approved the attorney as its closing agent, but then absconded with the funds and never paid off the plaintiff's existing mortgage

on the property.  Id. at 333–35.  The Court was required to "determine which party participating in the closing of a real-estate title must ultimately sustain the loss caused by the closing attorney's theft of moneys earmarked for the payment and satisfaction of an existing first mortgage on the property[,]" the innocent buyer or the title insurer.  Id. at 332.

The Court noted that "[t]he duty of good faith and fair dealing pervades insurance contracts."  Id. at 347 (citing Appleman, 12A Insurance Law and Practice § 7271, at 302 (1981)).  The Court held that the purchaser had a reasonable expectation "that he was obtaining a clear title — one that would not be encumbered by a preexisting mortgage — and insurance that would cover clear title."  Id. at 348–49.  The Court further said, "It is well established that insurance companies and brokers have a duty to advise insureds of their coverage needs where the insurer is aware of a particular peril."  Id. at 349.  Ultimately, the Court held that the title insurer "breached its duty of good faith and fair dealing in failing to apprise its insured . . . that there was an insurable risk of attorney defalcation and in failing expressly to provide or offer insurance coverage for that risk . . . ."  Id. at 352.

Certainly, at first blush, Sears provides plaintiff with compelling language to support her "reasonable expectations" argument.  However, none of the crucial facts supporting the Court's holding in Sears are present in this

A-4969-18

case. As the Court noted in Sears, the "case turn[ed] on the specific relationships between the parties and the roles and responsibilities of the several parties in completing a real-estate-title closing." Id. at 337. Importantly, in Sears, the defendant title insurer was permitted by statute to communicate only with the defalcating attorney, who was "approved" by the insurer. The insurer had no communication with the innocent purchaser, and also exercised authority and control over the attorney; the Court concluded the defalcating attorney was the insurer's agent. Id. at 341–46.

There were no facts in this case that demonstrate a similar agency relationship existed between defendant and anyone else except, perhaps, All Point. In fact, in New Jersey Lawyers' Fund for Client Protection v. Stewart Title Guaranty Co., the Court noted the important factual differences in that case from the facts in Sears and concluded that the lack of any agency relationship between the defalcating attorney and the defendant title insurer in Stewart meant "the [t]itle [c]ompany [was] not liable for the misappropriation by [the attorney]." 203 N.J. 208, 218–21 (2010). Given the lack of factual support, we do not find plaintiff's reliance on Sears to be persuasive.

Plaintiff further contends that defendant's failure to inform her of the Policy's shortcomings "constituted a negligent misrepresentation requiring

32

reformation."[10]   Negligent misrepresentation is "[a]n incorrect statement, negligently made and justifiably relied upon, [and] . . . economic loss . . . sustained as a consequence of that reliance."  Green v. Morgan Props., 215 N.J. 431, 457 (2013) (alterations in original) (quoting H. Rosenblum, Inc. v. Adler, 93 N.J. 324, 334 (1983)).  In the context of an insurance policy, such an incorrect statement could support an insured's claim that the policy was contrary to her reasonable expectations.  See Pizzullo v. N.J. Mfrs. Ins. Co., 196 N.J. 251, 271 (2008) (holding insurer's "inaccurate representation about the coverage made . . . through its customer service representative . . . created a reasonable expectation of [the insured]" that binds the insurer).

The motion judge rejected the argument, noting plaintiff was unaware of the Rule's requirements and therefore did not rely on any representation that the Policy complied with the Rule.  We basically agree.  Moreover, as already noted, plaintiff acknowledged that defendant made no representations whatsoever as to whether the Policy complied or did not comply with the Rule.

To the extent we have not otherwise addressed plaintiff's arguments, they lack sufficient merit to warrant discussion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[10]   The third count of plaintiff's amended complaint alleged, among other things, negligence on the part of All Point, but there was no separate claim of negligent misrepresentation against defendant.

A-4969-18